# SAWYER *v.* WHITLEY, WARDEN

No. 91–6382.  Argued February 25, 1992—Decided June 22, 1992

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, SCALIA, KENNEDY, SOUTER, and THOMAS, JJ., joined. BLACKMUN, J., filed an opinion concurring in the judgment, *post*, p. 350. STEVENS, J., filed an opinion concurring in the judgment, in which BLACKMUN and O'CONNOR, JJ., joined, *post*, p. 360.

*R. Neal Walker* argued the cause for petitioner. With him on the briefs were *Nicholas J. Trenticosta* and *Sarah L. Ottinger.*

*Dorothy A. Pendergast* argued the cause for respondent. With her on the brief was *John M. Mamoulides.*

*Paul J. Larkin, Jr.,* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Starr, Assistant Attorney General Mueller, Deputy Solicitor General Roberts,* and *Associate Deputy Attorney General McBride.**

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

The issue before the Court is the standard for determining whether a petitioner bringing a successive, abusive, or defaulted federal habeas claim has shown he is "actually innocent" of the death penalty to which he has been sentenced so that the court may reach the merits of the claim. Robert Wayne Sawyer, the petitioner in this case, filed a second

---

**Douglas G. Robinson, Julius L. Chambers, George H. Kendall,* and *Larry W. Yackle* filed a brief for the NAACP Legal Defense and Educational Fund, Inc., as *amicus curiae* urging reversal.

*Kent Scheidegger* and *Charles L. Hobson* filed a brief for the Criminal Justice Legal Foundation as *amicus curiae* urging affirmance.

federal habeas petition containing successive and abusive claims. The Court of Appeals for the Fifth Circuit refused to examine the merits of Sawyer's claims. It held that Sawyer had not shown cause for failure to raise these claims in his earlier petition, and that he had not shown that he was "actually innocent" of the crime of which he was convicted or the penalty which was imposed. 945 F. 2d 812 (1991). We affirm the Court of Appeals and hold that to show "actual innocence" one must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.

In 1979—13 years ago—petitioner and his accomplice, Charles Lane, brutally murdered Frances Arwood, who was a guest in the home petitioner shared with his girlfriend, Cynthia Shano, and Shano's two young children. As we recounted in our earlier review of this case, *Sawyer* v. *Smith*, 497 U. S. 227 (1990), petitioner and Lane returned to petitioner's home after a night of drinking and argued with Arwood, accusing her of drugging one of the children. Petitioner and Lane then attacked Arwood, beat her with their fists, kicked her repeatedly, submerged her in the bathtub, and poured scalding water on her before dragging her back into the living room, pouring lighter fluid on her body and igniting it. Arwood lost consciousness sometime during the attack and remained in a coma until she died of her injuries approximately two months later. Shano and her children were in the home during the attack, and Shano testified that petitioner prevented them from leaving.[1]

At trial, the jury failed to credit petitioner's "toxic psychosis" defense, and convicted petitioner of first-degree murder. At the sentencing phase, petitioner testified that he was intoxicated at the time of the murder and remembered

_____

[1] The facts are more fully recounted in the opinion of the Louisiana Supreme Court affirming petitioner's conviction and sentence. *State* v. *Sawyer*, 422 So. 2d 95, 97–98 (1982).

only bits and pieces of the events. Petitioner's sister, Glenda White, testified about petitioner's deprived childhood, about his affection and care for her children, and that as a teenager petitioner had been confined to a mental hospital for "no reason," where he had undergone shock therapy. 2 App. 505–516. The jury found three statutory aggravating factors and no statutory mitigating factors and sentenced petitioner to death.[2]

Sawyer's conviction and sentence were affirmed on appeal by the Louisiana Supreme Court. *State* v. *Sawyer*, 422 So. 2d 95 (1982). We granted certiorari, and vacated and remanded with instructions to reconsider in light of *Zant* v. *Stephens*, 462 U. S. 862 (1983). *Sawyer* v. *Louisiana*, 463 U. S. 1223 (1983). On remand, the Louisiana Supreme Court reaffirmed the sentence. *Sawyer* v. *State*, 442 So. 2d 1136 (1983), cert. denied, 466 U. S. 931 (1984). Petitioner's first petition for state postconviction relief was denied. *Louisiana ex rel. Sawyer* v. *Maggio*, 479 So. 2d 360, reconsideration denied, 480 So. 2d 313 (La. 1985).[3] In 1986, Sawyer filed his first federal habeas petition, raising 18 claims, all of which were denied on the merits. See *Sawyer* v. *Butler*, 848 F. 2d 582 (CA5 1988), aff'd on rehearing en banc, 881 F. 2d 1273 (CA5 1989). We again granted certiorari and affirmed the Court of Appeals' denial of relief. *Sawyer* v. *Smith, supra*.[4]

---

[2]The jury found the following statutory aggravating factors: "(1) that [Sawyer] was engaged in the commission of aggravated arson, (2) that the offense was committed in an especially cruel, atrocious and heinous manner, and (3) that [Sawyer] had previously been convicted of an unrelated murder." *Id.*, at 100. The Louisiana Supreme Court held that the last aggravating circumstance was not supported by the evidence. *Id.*, at 101.

[3]The Louisiana Supreme Court twice remanded to the trial court for hearings on petitioner's ineffective-assistance-of-counsel claim. *Louisiana ex rel. Sawyer* v. *Maggio*, 450 So. 2d 355 (1984); *Louisiana ex rel. Sawyer* v. *Maggio*, 468 So. 2d 554 (1985).

[4]In this earlier review, we held that *Caldwell* v. *Mississippi*, 472 U. S. 320 (1985), could not be applied retroactively to petitioner's case under *Teague* v. *Lane*, 489 U. S. 288 (1989).

Petitioner next filed a second motion for state postconviction relief. The state trial court summarily denied this petition as repetitive and without merit, and the Louisiana Supreme Court denied discretionary review. See 945 F. 2d, at 815.

The present petition before this Court arises out of Sawyer's second petition for federal habeas relief. After granting a stay and holding an evidentiary hearing, the District Court denied one of Sawyer's claims on the merits and held that the others were barred as either abusive or successive. 772 F. Supp. 297 (ED La. 1991). The Court of Appeals granted a certificate of probable cause on the issue whether petitioner had shown that he is actually "innocent of the death penalty" such that a court should reach the merits of the claims contained in this successive petition. 945 F. 2d, at 814. The Court of Appeals held that petitioner had failed to show that he was actually innocent of the death penalty because the evidence he argued had been unconstitutionally kept from the jury failed to show that Sawyer was ineligible for the death penalty under Louisiana law. For the third time we granted Sawyer's petition for certiorari, 502 U. S. 965 (1991), and we now affirm.

Unless a habeas petitioner shows cause and prejudice, see *Wainwright* v. *Sykes*, 433 U. S. 72 (1977), a court may not reach the merits of: (a) *successive claims* that raise grounds identical to grounds heard and decided on the merits in a previous petition, *Kuhlmann* v. *Wilson*, 477 U. S. 436 (1986); (b) new claims, not previously raised, which constitute an *abuse of the writ*, *McCleskey* v. *Zant*, 499 U. S. 467 (1991); or (c) *procedurally defaulted claims* in which the petitioner failed to follow applicable state procedural rules in raising the claims, *Murray* v. *Carrier*, 477 U. S. 478 (1986). These cases are premised on our concerns for the finality of state judgments of conviction and the "significant costs of federal habeas review." *McCleskey, supra,* at 490–491; see, *e. g., Engle* v. *Isaac,* 456 U. S. 107, 126–128 (1982).

We have previously held that even if a state prisoner cannot meet the cause and prejudice standard, a federal court may hear the merits of the successive claims if the failure to hear the claims would constitute a "miscarriage of justice." In a trio of 1986 decisions, we elaborated on the miscarriage of justice, or "actual innocence," exception. As we explained in *Kuhlmann* v. *Wilson, supra,* the exception developed from the language of the federal habeas statute, which, prior to 1966, allowed successive claims to be denied without a hearing if the judge were "satisfied that the *ends of justice will not be served by such inquiry." Id.,* at 448. We held that despite the removal of this statutory language from 28 U. S. C. § 2244(b) in 1966, the miscarriage of justice exception would allow successive claims to be heard if the petitioner "establish[es] that under the probative evidence he has a colorable claim of factual innocence." *Kuhlmann, supra,* at 454.[5] In the second of these cases we held that the actual innocence exception also applies to procedurally defaulted claims. *Murray* v. *Carrier, supra.*[6]

In *Smith* v. *Murray,* 477 U. S. 527 (1986), we found no miscarriage of justice in the failure to examine the merits of procedurally defaulted claims in the capital sentencing context. We emphasized that the miscarriage of justice exception is concerned with actual as compared to legal innocence,

---

[5] Our standard for determining actual innocence was articulated in *Kuhlmann* as: "[T]he prisoner must 'show a fair probability that, in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial, the trier of the facts would have entertained a reasonable doubt of his guilt.'" 477 U. S., at 455, n. 17, quoting Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 160 (1970).

[6] We stated that the merits of a defaulted claim could be reached "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent . . . ." *Murray* v. *Carrier,* 477 U. S., at 496.

and acknowledged that actual innocence "does not translate easily into the context of an alleged error at the sentencing phase of a trial on a capital offense." *Id.*, at 537. We decided that the habeas petitioner in that case had failed to show actual innocence of the death penalty because the "alleged constitutional error neither precluded the development of true facts nor resulted in the admission of false ones." *Id.*, at 538.

In subsequent cases, we have emphasized the narrow scope of the fundamental miscarriage of justice exception. In *Dugger* v. *Adams*, 489 U. S. 401 (1989), we rejected the petitioner's claim that his procedural default should be excused because he had shown that he was actually innocent. Without endeavoring to define what it meant to be actually innocent of the death penalty, we stated that "[d]emonstrating that an error is by its nature the kind of error that might have affected the accuracy of a death sentence is far from demonstrating that an individual defendant probably is 'actually innocent' of the sentence he or she received." *Id.*, at 412, n. 6. Just last Term in *McCleskey* v. *Zant, supra,* at 502, we held that the "narrow exception" for miscarriage of justice was of no avail to the petitioner because the constitutional violation, if it occurred, "resulted in the admission at trial of truthful inculpatory evidence which did not affect the reliability of the guilt determination."

The present case requires us to further amplify the meaning of "actual innocence" in the setting of capital punishment. A prototypical example of "actual innocence" in a colloquial sense is the case where the State has convicted the wrong person of the crime. Such claims are of course regularly made on motions for new trial after conviction in both state and federal courts, and quite regularly denied because the evidence adduced in support of them fails to meet the rigorous standards for granting such motions. But in rare instances it may turn out later, for example, that another person has credibly confessed to the crime, and it is evident

that the law has made a mistake. In the context of a non-capital case, the concept of "actual innocence" is easy to grasp.

It is more difficult to develop an analogous framework when dealing with a defendant who has been sentenced to death. The phrase "innocent of death" is not a natural usage of those words, but we must strive to construct an analog to the simpler situation represented by the case of a noncapital defendant. In defining this analog, we bear in mind that the exception for "actual innocence" is a very narrow exception, and that to make it workable it must be subject to determination by relatively objective standards. In the every day context of capital penalty proceedings, a federal district judge typically will be presented with a successive or abusive habeas petition a few days before, or even on the day of, a scheduled execution, and will have only a limited time to determine whether a petitioner has shown that his case falls within the "actual innocence" exception if such a claim is made.[7]

Since our decision in *Furman* v. *Georgia*, 408 U. S. 238 (1972), our Eighth Amendment jurisprudence has required those States imposing capital punishment to adopt procedural safeguards protecting against arbitrary and capricious impositions of the death sentence. See, *e. g., Gregg* v. *Georgia*, 428 U. S. 153 (1976); *Proffitt* v. *Florida*, 428 U. S. 242 (1976); *Jurek* v. *Texas*, 428 U. S. 262 (1976). In response, the States have adopted various narrowing factors that limit the

---

[7] While we recognize this as a fact on the basis of our own experience with applications for stays of execution in capital cases, we regard it as a regrettable fact. We of course do not in the least condone, but instead condemn, any efforts on the part of habeas petitioners to delay their filings until the last minute with a view to obtaining a stay because the district court will lack time to give them the necessary consideration before the scheduled execution. A court may resolve against such a petitioner doubts and uncertainties as to the sufficiency of his submission. See *Gomez* v. *United States Dist. Court for Northern Dist. of Cal.,* 503 U. S. 653 (1992) *(per curiam).*

class of offenders upon which the sentencer is authorized to impose the death penalty. For example, the Louisiana statute under which petitioner was convicted defines first-degree murder, a capital offense, as something more than intentional killing.[8] In addition, after a defendant is found guilty in Louisiana of capital murder, the jury must also find at the sentencing phase beyond a reasonable doubt at least one of a list of statutory aggravating factors before it may recommend that the death penalty be imposed.[9]

But once eligibility for the death penalty has been established to the satisfaction of the jury, its deliberations assume a different tenor. In a series of cases beginning with *Lockett* v. *Ohio*, 438 U. S. 586, 604 (1978), we have held that the

---

[8] Louisiana Rev. Stat. Ann. § 14:30 (West 1986 and Supp. 1992) defines first-degree murder:

"First degree murder is the killing of a human being:

"(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, second degree kidnapping, aggravated escape, aggravated arson, aggravated rape, forcible rape, aggravated burglary, armed robbery, first degree robbery or simple robbery;

"(2) When the offender has a specific intent to kill or to inflict great bodily harm upon a fireman or peace officer engaged in the performance of his lawful duties;

"(3) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person; or

"(4) When the offender has specific intent to kill or inflict great bodily harm and has offered, has been offered, has given, or has received anything of value for the killing.

.    .    .    .    .

"Whoever commits the crime of first degree murder shall be punished by death or life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence in accordance with the determination of the jury."

[9] At the time of petitioner's trial La. Code Crim. Proc. Ann., Art. 905.3 (West 1984), provided: "A sentence of death shall not be imposed unless the jury finds beyond a reasonable doubt that at least one statutory aggravating circumstance exists and, after consideration of any mitigating circumstances, recommends that the sentence of death be imposed."

defendant must be permitted to introduce a wide variety of mitigating evidence pertaining to his character and background. The emphasis shifts from narrowing the class of eligible defendants by objective factors to individualized consideration of a particular defendant. Consideration of aggravating factors together with mitigating factors, in various combinations and methods dependent upon state law, results in the jury's or judge's ultimate decision as to what penalty shall be imposed.

Considering Louisiana law as an example, then, there are three possible ways in which "actual innocence" might be defined. The strictest definition would be to limit any showing to the elements of the crime which the State has made a capital offense. The showing would have to negate an essential element of that offense. The Solicitor General, filing as *amicus curiae* in support of respondent, urges the Court to adopt this standard. We reject this submission as too narrow, because it is contrary to the statement in *Smith* that the concept of "actual innocence" could be applied to mean "innocent" of the death penalty. 477 U. S., at 537. This statement suggested a more expansive meaning to the term of "actual innocence" in a capital case than simply innocence of the capital offense itself.

The most lenient of the three possibilities would be to allow the showing of "actual innocence" to extend not only to the elements of the crime, but also to the existence of aggravating factors, and to mitigating evidence that bore not on the defendant's eligibility to receive the death penalty, but only on the ultimate discretionary decision between the death penalty and life imprisonment. This, in effect, is what petitioner urges upon us. He contends that actual innocence of the death penalty exists where "there is a 'fair probability' that the admission of false evidence, or the preclusion of true mitigating evidence, [caused by a constitutional error] resulted in a sentence of death." Brief for Petitioner 18 (cita-

tion and footnote omitted).[10] Although petitioner describes his standard as narrower than that adopted by the Eighth and Ninth Circuits,[11] in reality it is only more closely related to the facts of his case in which he alleges that constitutional error kept true mitigating evidence from the jury. The crucial consideration, according to petitioner, is whether due to constitutional error the sentencer was presented with "'a *factually inaccurate sentencing profile*'" of the petitioner. Brief for Petitioner 15, n. 21, quoting *Johnson* v. *Singletary*, 938 F. 2d 1166, 1200 (CA11 1991) (en banc) (Anderson, J., dissenting).

Insofar as petitioner's standard would include not merely the elements of the crime itself, but the existence of aggravating circumstances, it broadens the extent of the inquiry but not the type of inquiry. Both the elements of the crime and statutory aggravating circumstances in Louisiana are

---

[10] Petitioner's standard derives from language in *Smith* v. *Murray*, 477 U. S. 527 (1986). Petitioner maintains that *Smith* holds that if one can show that the error precludes the development of true mitigating evidence, actual innocence has been shown. Brief for Petitioner 21. By emphasizing that in *Smith* the fundamental miscarriage of justice exception had not been met because, *inter alia*, the constitutional error did not lead the jury to consider any false evidence, we did not hold its converse, that an error which leads to the consideration of "false" mitigating evidence amounts to a miscarriage of justice.

[11] In *Deutscher* v. *Whitley*, 946 F. 2d 1443 (1991), the Ninth Circuit phrased its test as follows: "To establish a fundamental miscarriage of justice at sentencing, a defendant must establish that constitutional error substantially undermined the accuracy of the capital sentencing determination. This requires a showing that constitutional error infected the sentencing process to such a degree that it is more probable than not that, but for constitutional error, the sentence of death would not have been imposed." *Id.*, at 1446 (citations omitted).

The Eighth Circuit has adopted a similar test: "'In the penalty-phase context, this exception will be available if the federal constitutional error alleged probably resulted in a verdict of death against one whom the jury would otherwise have sentenced to life imprisonment.'" *Stokes* v. *Armontrout*, 893 F. 2d 152, 156 (1989), quoting *Smith* v. *Armontrout*, 888 F. 2d 530, 545 (1989).

used to narrow the class of defendants eligible for the death penalty. And proof or disproof of aggravating circumstances, like proof of the elements of the crime, is confined by the statutory definitions to a relatively obvious class of relevant evidence. Sensible meaning is given to the term "innocent of the death penalty" by allowing a showing in addition to innocence of the capital crime itself a showing that there was no aggravating circumstance or that some other condition of eligibility had not been met.[12]

But we reject petitioner's submission that the showing should extend beyond these elements of the capital sentence to the existence of additional mitigating evidence. In the first place, such an extension would mean that "actual innocence" amounts to little more than what is already required to show "prejudice," a necessary showing for habeas relief for many constitutional errors. See, e. g., *United States* v. *Bagley*, 473 U. S. 667, 682 (1985); *Strickland* v. *Washington*, 466 U. S. 668, 694 (1984). If federal habeas review of capital sentences is to be at all rational, petitioner must show something more in order for a court to reach the merits of his claims on a successive habeas petition than he would have had to show to obtain relief on his first habeas petition.[13]

But, more importantly, petitioner's standard would so broaden the inquiry as to make it anything but a "narrow" exception to the principle of finality that we have previously described it to be. A federal district judge confronted with

[12] Louisiana narrows the class of those eligible for the death penalty by limiting the type of offense for which it may be imposed, and by requiring a finding of at least one aggravating circumstance. See *supra*, at 342. Statutory provisions for restricting eligibility may, of course, vary from State to State.

[13] If a showing of actual innocence were reduced to actual prejudice, it would allow the evasion of the cause and prejudice standard which we have held also acts as an "exception" to a defaulted, abusive, or successive claim. In practical terms a petitioner would no longer have to show cause, contrary to our prior cases. *McCleskey* v. *Zant*, 499 U. S. 467, 494–495 (1991); *Carrier*, 477 U. S., at 493.

a claim of actual innocence may with relative ease determine whether a submission, for example, that a killing was not intentional, consists of credible, noncumulative, and admissible evidence negating the element of intent. But it is a far more difficult task to assess how jurors would have reacted to additional showings of mitigating factors, particularly considering the breadth of those factors that a jury under our decisions must be allowed to consider.[14]

The Court of Appeals in this case took the middle ground among these three possibilities for defining "actual innocence" of the death penalty, and adopted this test:

> "[W]e must require the petitioner to show, based on the evidence proffered plus all record evidence, a fair probability that a rational trier of fact would have entertained a reasonable doubt as to the existence of those facts which are prerequisites under state or federal law for the imposition of the death penalty." 945 F. 2d, at 820 (footnotes omitted).

---

[14] The "clearly-erroneous" standard suggested by JUSTICE STEVENS' opinion concurring in the judgment suffers from this weakness and others as well. The term "clearly erroneous" derives from Federal Rule of Civil Procedure 52(a), which provides that "findings of fact [in actions tried without a jury] shall not be set aside unless clearly erroneous." JUSTICE STEVENS wrenches the term out of this context—where it applies to written factual findings made by a trial judge—and would apply it to the imposition of the death sentence by a jury or judge. Not only is the latter determination different both quantitatively and qualitatively from a finding of fact in a bench trial, but JUSTICE STEVENS would not even bring with the term its established meaning in reviewing factfindings in bench trials. We held in *United States* v. *United States Gypsum Co.*, 333 U. S. 364, 395 (1948), and reaffirmed in *Anderson* v. *Bessemer City*, 470 U. S. 564, 573 (1985), that "'[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" But JUSTICE STEVENS would apparently equate it with the standard traditionally used for review of jury verdicts—that no reasonable sentencer could have imposed the death penalty. *Post*, at 371. Cf. *Jackson* v. *Virginia*, 443 U. S. 307, 316–318 (1979).

The Court of Appeals standard therefore hones in on the objective factors or conditions that must be shown to exist before a defendant is eligible to have the death penalty imposed. The Eleventh Circuit has adopted a similar "eligibility" test for determining actual innocence. *Johnson* v. *Singletary*, 938 F. 2d 1166 (1991), cert. pending, No. 91-6576.[15] We agree with the Courts of Appeals for the Fifth and Eleventh Circuits that the "actual innocence" requirement must focus on those elements that render a defendant eligible for the death penalty, and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error.

In the present petition, Sawyer advances two claims, arising from two distinct groups of evidentiary facts that were not considered by the jury that convicted and sentenced Sawyer. The first group of evidence relates to petitioner's role in the offense and consists of affidavits attacking the credibility of Cynthia Shano and an affidavit claiming that one of Shano's sons told a police officer that Sawyer was not responsible for pouring lighter fluid on Arwood and lighting it, and that in fact Sawyer tried to prevent Charles Lane from lighting Arwood on fire. Sawyer claims that the police failed to produce this exculpatory evidence in violation of his due process rights under *Brady* v. *Maryland*, 373 U. S. 83 (1963). The second group consists of medical records from Sawyer's stays as a teenager in two different mental health

---

[15] The Eleventh Circuit articulated the following test:

"Thus, a petitioner may make a colorable showing that he is actually innocent of the death penalty by presenting evidence that an alleged constitutional error implicates *all* of the aggravating factors found to be present by the sentencing body. That is, but for the alleged constitutional error, the sentencing body *could not* have found *any* aggravating factors and thus the petitioner was ineligible for the death penalty. In other words, the petitioner must show that absent the alleged constitutional error, the jury would have lacked the discretion to impose the death penalty; that is, that he is *ineligible* for the death penalty." *Johnson* v. *Singletary*, 938 F. 2d, at 1183 (emphasis in original).

institutions. Sawyer alleges ineffective assistance of counsel in trial counsel's failure to introduce these records in the sentencing phase of his trial.

The Court of Appeals held that petitioner's failure to assert his *Brady* claim in his first petition constituted an abuse of the writ, and that he had not shown cause for failing to raise the claim earlier under *McCleskey*. 945 F. 2d, at 824. The ineffective-assistance claim was held by the Court of Appeals to be a successive claim because it was rejected on the merits in Sawyer's first petition, and petitioner failed to show cause for not bringing all the evidence in support of this claim earlier. *Id.*, at 823. Petitioner does not contest these findings of the Court of Appeals. Tr. of Oral Arg. 7. Therefore, we must determine if petitioner has shown by clear and convincing evidence that but for constitutional error, no reasonable juror would find him eligible for the death penalty under Louisiana law.

Under Louisiana law, petitioner is eligible for the death penalty because he was convicted of first-degree murder—that is, an intentional killing while in the process of committing an aggravated arson—and because at the sentencing phase the jury found two valid aggravating circumstances: that the murder was committed in the course of an aggravated arson, and that the murder was especially cruel, atrocious, and heinous. The psychological evidence petitioner alleges was kept from the jury due to the ineffective assistance of counsel does not relate to petitioner's guilt or innocence of the crime.[16] Neither does it relate to either of the aggravating factors found by the jury that made petitioner eligible for the death penalty. Even if this evidence had been before the jury, it cannot be said that a reasonable juror would not have found both of the aggravating factors that

---

[16] Petitioner does not allege that his mental condition was such that he could not form criminal intent under Louisiana law. Tr. of Oral Arg. 10.

make petitioner eligible for the death penalty.[17]   Therefore, as to this evidence, petitioner has not shown that there would be a fundamental miscarriage of justice for the Court to fail to reexamine the merits of this successive claim.

We are convinced that the evidence allegedly kept from the jury due to an alleged *Brady* violation also fails to show that the petitioner is actually innocent of the death penalty to which he has been sentenced.   Much of the evidence goes to the credibility of Shano, suggesting, *e. g.,* that contrary to her testimony at trial she knew Charles Lane prior to the day of the murder; that she was drinking the day before the murder; and that she testified under a grant of immunity from the prosecutor.   2 App. 589–608.   This sort of latter-day evidence brought forward to impeach a prosecution witness will seldom, if ever, make a clear and convincing showing that no reasonable juror would have believed the heart of Shano's account of petitioner's actions.

The final bit of evidence petitioner alleges was unconstitutionally kept from the jury due to a *Brady* violation was a statement made by Shano's then 4-year-old son, Wayne, to a police officer the day after the murder.   Petitioner has submitted an affidavit from one Diane Thibodeaux stating that she was present when Wayne told a police detective who asked who had lit Arwood on fire that "Daddy [Sawyer] tried to help the lady" and that the "other man" had pushed Sawyer back into a chair.   2 App. 587.   The affidavit also states that Wayne showed the officer where to find a cigarette lighter and a can of lighter fluid in the trash.   *Ibid.*   Because this evidence goes to the jury's finding of aggravated arson, it goes both to petitioner's guilt or innocence of the crime of first-degree murder and the aggravating circumstance of a murder committed in the course of an aggravated arson.   However, we conclude that this affidavit, in view of

_____

[17] In the same category are the affidavits from petitioner's family members attesting to the deprivation and abuse suffered by petitioner as a child.   2 App. 571–584.

all the other evidence in the record, does not show that no rational juror would find that petitioner committed both of the aggravating circumstances found by the jury. The murder was especially cruel, atrocious, and heinous based on the undisputed evidence of torture before the jury quite apart from the arson (*e. g.*, beating, scalding with boiling water). As for the finding of aggravated arson, we agree with the Court of Appeals that, even crediting the information in the hearsay affidavit,[18] it cannot be said that no reasonable juror would have found, in light of all the evidence, that petitioner was guilty of the aggravated arson for his participation under the Louisiana law of principals.[19]

We therefore hold that petitioner has failed to show by clear and convincing evidence that but for constitutional error at his sentencing hearing, no reasonable juror would have found him eligible for the death penalty under Louisiana law. The judgment of the Court of Appeals is therefore

*Affirmed.*

JUSTICE BLACKMUN, concurring in the judgment.

I cannot agree with the majority that a federal court is absolutely barred from reviewing a capital defendant's abu-

---

[18] Wayne Shano apparently has no clear memory of the crime today. *Id.*, at 602–603. This fact, together with his tender years at the time of the occurrence, suggests that Wayne himself would not corroborate the affidavit of Diane Thibodeaux, thus suggesting an independent basis for refusing to find that the affidavit showed anything by clear and convincing evidence.

[19] Louisiana Rev. Stat. Ann. § 14:24 (West 1986) defines principals as: "All persons concerned in the commission of a crime . . . and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals."

Even considering the affidavit of Wayne Shano, it cannot be said that no reasonable juror would have found that petitioner committed the aggravated arson, given Cynthia Shano's testimony as to petitioner's statements to Lane on the day of the murder and petitioner's fingerprints on the can of lighter fluid.

sive, successive, or procedurally defaulted claim unless the defendant can show "by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *Ante*, at 336. For the reasons stated by JUSTICE STEVENS in his separate opinion, *post*, p. 360, which I join, I believe that the Court today adopts an unduly cramped view of "actual innocence." I write separately not to discuss the specifics of the Court's standard, but instead to reemphasize my opposition to an implicit premise underlying the Court's decision: that the only "fundamental miscarriage of justice" in a capital proceeding that warrants redress is one where the petitioner can make out a claim of "actual innocence." I also write separately to express my ever-growing skepticism that, with each new decision from this Court constricting the ability of the federal courts to remedy constitutional errors, the death penalty really can be imposed fairly and in accordance with the requirements of the Eighth Amendment.

I

The Court repeatedly has recognized that principles of fundamental fairness underlie the writ of habeas corpus. See *Engle* v. *Isaac*, 456 U. S. 107, 126 (1982); *Sanders* v. *United States*, 373 U. S. 1, 17–18 (1963). Even as the Court has erected unprecedented and unwarranted barriers to the federal judiciary's review of the merits of claims that state prisoners failed properly to present to the state courts, or failed to raise in their first federal habeas petitions, or previously presented to the federal courts for resolution, it consistently has acknowledged that exceptions to these rules of unreviewability must exist to prevent violations of fundamental fairness. See *Engle*, 456 U. S., at 135 (principles of finality and comity "must yield to the imperative of correcting a fundamentally unjust incarceration"). Thus, the Court has held, federal courts may review procedurally defaulted, abusive, or successive claims absent a showing of cause and

prejudice if the failure to do so would thwart the "ends of justice," see *Kuhlmann* v. *Wilson*, 477 U. S. 436, 455 (1986) (plurality opinion), or work a "fundamental miscarriage of justice," see *Murray* v. *Carrier*, 477 U. S. 478, 495–496 (1986); *Smith* v. *Murray*, 477 U. S. 527, 537–538 (1986); *Dugger* v. *Adams*, 489 U. S. 401, 412, n. 6 (1989); *McCleskey* v. *Zant*, 499 U. S. 467, 493–494 (1991).

By the traditional understanding of habeas corpus, a "fundamental miscarriage of justice" occurs whenever a conviction or sentence is secured in violation of a federal constitutional right. See 28 U. S. C. § 2254(a) (federal courts "shall entertain" habeas petitions from state prisoners who allege that they are "in custody in violation of the Constitution or laws or treaties of the United States"); *Smith*, 477 U. S., at 543–544 (STEVENS, J., dissenting). Justice Holmes explained that the concern of a federal court in reviewing the validity of a conviction and death sentence on a writ of habeas corpus is "solely the question whether [the petitioner's] constitutional rights have been preserved." *Moore* v. *Dempsey*, 261 U. S. 86, 88 (1923).

In a trio of 1986 decisions, however, the Court ignored these traditional teachings and, out of a purported concern for state sovereignty, for the preservation of state resources, and for the finality of state-court judgments, shifted the focus of federal habeas review of procedurally defaulted, successive, or abusive claims away from the preservation of constitutional rights to a fact-based inquiry into the petitioner's innocence or guilt. See *Wilson*, 477 U. S., at 454 (plurality opinion) ("[T]he 'ends of justice' require federal courts to entertain [successive] petitions only where the prisoner supplements his constitutional claim with a colorable showing of factual innocence"); *Carrier*, 477 U. S., at 496 ("[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default");

*Smith,* 477 U. S., at 537 (applying *Carrier* standard to constitutional error at sentencing phase of capital trial). See also *McCleskey,* 499 U. S., at 493 (applying *Carrier* standard in "abuse of the writ" context).

The Court itself has acknowledged that "the concept of 'actual,' as distinct from 'legal,' innocence does not translate easily into the context of an alleged error at the sentencing phase of a trial on a capital offense." *Smith,* 477 U. S., at 537. Undaunted by its own illogic, however, the Court adopted just such an approach in *Smith.* There, the Court was confronted with a claim that the introduction at sentencing of inculpatory statements made by Smith to a court-appointed psychiatrist violated the Fifth Amendment because Smith had not been informed that his statements might be used against him or that he had the right to remain silent and to have counsel present. Although the Court assumed the validity of Smith's Fifth Amendment claim[1] and recognized the potential impact of the statement on the jury, which found the aggravating circumstance of "future dangerousness" satisfied, see *id.,* at 538, it nonetheless concluded, remarkably and summarily, that admission of the statement did not "pervert the jury's deliberations concerning the ultimate question whether *in fact* petitioner constituted a continuing threat to society," *ibid.* (emphasis in original). Because Michael Smith could not demonstrate cause for his procedural default, and because, in the Court's view, he had not made a substantial showing that the alleged constitutional violation "undermined the accuracy of the guilt or sentencing determination," *id.,* at 539, his Fifth Amendment claim went unaddressed and he was executed on July 31, 1986.

---

[1] JUSTICE STEVENS explained in his dissenting opinion in *Smith,* 477 U. S., at 551–553, that the introduction of the inculpatory statement clearly violated Smith's rights as established in *Estelle* v. *Smith,* 451 U. S. 454 (1981).

In *Dugger* v. *Adams*, the Court continued to equate the notion of a "fundamental miscarriage of justice" in a capital trial with the petitioner's ability to show that he or she "probably is 'actually innocent' of the sentence he or she received," 489 U. S., at 412, n. 6, but appeared to narrow the inquiry even further. Adams' claim, that the trial judge repeatedly had misinformed the jurors, in violation of the Eighth Amendment and *Caldwell* v. *Mississippi*, 472 U. S. 320 (1985), that their sentencing vote was strictly advisory in nature (when in fact Florida law permitted the judge to overturn the jury's sentencing decision only upon a clear and convincing showing that its choice was erroneous), surely satisfied the standard articulated in *Smith:* whether petitioner can make out a "substantial claim that the alleged error undermined the accuracy of the guilt or sentencing determination." 477 U. S., at 539. In a cryptic discussion relegated to a footnote at the end of its opinion, the Court in *Adams* rejected this obvious application of the *Smith* standard, apparently for no other reason than its belief that Adams' ability to demonstrate a "fundamental miscarriage of justice" in this case somehow would convert an "extraordinary" exception into an "ordinary" one. See 489 U. S., at 412, n. 6. In rejecting the *Smith* standard, the Court did not even bother to substitute another in its place. See 489 U. S., at 412, n. 6 ("We do not undertake here to define what it means to be 'actually innocent' of a death sentence"). The Court refused to address Aubrey Adams' claim of constitutional error, and he was executed on May 4, 1989.

Just last Term, in *McCleskey* v. *Zant*, the Court again described the "fundamental miscarriage of justice" exception as a " 'safeguard against compelling an innocent man to suffer an unconstitutional loss of liberty,' " 499 U. S., at 495 (quoting *Stone* v. *Powell*, 428 U. S. 465, 491–492, n. 31 (1976)). Although the District Court granted relief to McCleskey on his claim that state authorities deliberately had elicited inculpatory admissions from him in violation of his Sixth

Amendment right to counsel, see *Massiah* v. *United States*, 377 U. S. 201 (1964), and excused his failure to present the claim in his first federal habeas petition because the State had withheld documents and information establishing that claim, see 499 U. S., at 475–476, the Court concluded that McCleskey lacked cause for failing to raise the claim earlier, *id.*, at 502. More important for our purposes, the Court concluded that the "narrow exception" by which federal courts may "exercise [their] equitable discretion to correct a miscarriage of justice" was of "no avail" to McCleskey: The "*Massiah* violation, if it be one, resulted in the admission at trial of truthful inculpatory evidence which did not affect the reliability of the guilt determination." *Ibid.* The Court refused to address Warren McCleskey's claim of constitutional error, and he was executed on September 24, 1991.

The Court today takes for granted that the foregoing decisions correctly limited the concept of a "fundamental miscarriage of justice" to "actual innocence," even as it struggles, by ignoring the "natural usage of those words" and resorting to "analog[s]," see *ante*, at 341, to make sense of "actual innocence" in the capital context. I continue to believe, however, that the Court's "exaltation of accuracy as the only characteristic of 'fundamental fairness' is deeply flawed." *Smith*, 477 U. S., at 545 (STEVENS, J., dissenting).

As an initial matter, the Court's focus on factual innocence is inconsistent with Congress' grant of habeas corpus jurisdiction, pursuant to which federal courts are instructed to entertain petitions from state prisoners who allege that they are held "in custody in violation of the Constitution or laws or treaties of the United States." 28 U. S. C. §2254(a). The jurisdictional grant contains no support for the Court's decision to narrow the reviewing authority and obligation of the federal courts to claims of factual innocence. See also 28 U. S. C. §2243 ("The court shall . . . dispose of the matter as law and justice require"). In addition, the actual innocence standard requires a reviewing federal court, unnaturally, to

"function in much the same capacity as the state trier of fact"; that is, to "make a rough decision on the question of guilt or innocence." *Wilson*, 477 U. S., at 471, n. 7 (Brennan, J., dissenting).

Most important, however, the focus on innocence assumes, erroneously, that the only value worth protecting through federal habeas review is the accuracy and reliability of the guilt determination. But "[o]ur criminal justice system, and our Constitution, protect other values in addition to the reliability of the guilt or innocence determination, and the statutory duty to serve 'law and justice' should similarly reflect those values." *Smith*, 477 U. S., at 545 (STEVENS, J., dissenting). The accusatorial system of justice adopted by the Founders affords a defendant certain process-based protections that do not have accuracy of truth finding as their primary goal. These protections—including the Fifth Amendment right against compelled self-incrimination, the Eighth Amendment right against the imposition of an arbitrary and capricious sentence, the Fourteenth Amendment right to be tried by an impartial judge, and the Fourteenth Amendment right not to be indicted by a grand jury or tried by a petit jury from which members of the defendant's race have been systematically excluded—are debased, and indeed, rendered largely irrelevant, in a system that values the accuracy of the guilt determination above individual rights.

Nowhere is this single-minded focus on actual innocence more misguided than in a case where a defendant alleges a constitutional error in the sentencing phase of a capital trial. The Court's ongoing struggle to give meaning to "innocence of death" simply reflects the inappropriateness of the inquiry. See *Smith*, 477 U. S., at 537; *Adams*, 489 U. S., at 412, n. 6; *ante*, at 340. "Guilt or innocence is irrelevant in that context; rather, there is only a decision made by representatives of the community whether the prisoner shall live or die." *Wilson*, 477 U. S., at 471–472, n. 7 (Brennan, J., dissenting).

See also Patchel, The New Habeas, 42 Hastings L. J. 941, 972 (1991).

Only by returning to the federal courts' central and traditional function on habeas review, evaluating claims of constitutional error, can the Court ensure that the ends of justice are served and that fundamental miscarriages of justice do not go unremedied. The Court would do well to heed Justice Black's admonition: "[I]t is never too late for courts in habeas corpus proceedings to look straight through procedural screens in order to prevent forfeiture of life or liberty in flagrant defiance of the Constitution." *Brown* v. *Allen*, 344 U. S. 443, 554 (1953) (dissenting opinion).[2]

## II

### A

When I was on the United States Court of Appeals for the Eighth Circuit, I once observed, in the course of reviewing a death sentence on a writ of habeas corpus, that the decisional process in a capital case is "particularly excruciating" for someone "who is not personally convinced of the rightness of capital punishment and who questions it as an effective deterrent." *Maxwell* v. *Bishop*, 398 F. 2d 138, 153–154 (1968), vacated, 398 U. S. 262 (1970). At the same time, however, I stated my then belief that "the advisability of capital punishment is a policy matter ordinarily to be resolved by the legislature." *Id.*, at 154. Four years later, as a Member of this Court, I echoed those sentiments in my separate dissenting opinion in *Furman* v. *Georgia*, 408 U. S. 238, 405 (1972). Although I reiterated my personal distaste for the

---

[2] Notwithstanding my view that the Court has erred in narrowing the concept of a "fundamental miscarriage of justice" to cases of "actual innocence," I have attempted faithfully to apply the "actual innocence" standard in prior cases. See, *e. g.*, *Dugger* v. *Adams*, 489 U. S. 401, 424, n. 15 (1989) (dissenting opinion). I therefore join JUSTICE STEVENS' analysis of the "actual innocence" standard and his application of that standard to the facts of this case. See *post*, p. 360.

death penalty and my doubt that it performs any meaningful deterrent function, see *id.*, at 405–406, I declined to join my Brethren in declaring the state statutes at issue in those cases unconstitutional. See *id.*, at 411 ("We should not allow our personal preferences as to the wisdom of legislative and congressional action, or our distaste for such action, to guide our judicial decision").

My ability in *Maxwell, Furman,* and the many other capital cases I have reviewed during my tenure on the federal bench to enforce, notwithstanding my own deep moral reservations, a legislature's considered judgment that capital punishment is an appropriate sanction, has always rested on an understanding that certain procedural safeguards, chief among them the Federal Judiciary's power to reach and correct claims of constitutional error on federal habeas review, would ensure that death sentences are fairly imposed. Today, more than 20 years later, I wonder what is left of that premise underlying my acceptance of the death penalty.

## B

Only last Term I had occasion to lament the Court's continuing "crusade to erect petty procedural barriers in the path of any state prisoner seeking review of his federal constitutional claims" and its transformation of "the duty to protect federal rights into a self-fashioned abdication." *Coleman* v. *Thompson,* 501 U. S. 722, 759, 761 (1991) (dissenting opinion). This Term has witnessed the continued narrowing of the avenues of relief available to federal habeas petitioners seeking redress of their constitutional claims. See, *e. g., Keeney* v. *Tamayo-Reyes,* 504 U. S. 1 (1992) (overruling in part *Townsend* v. *Sain,* 372 U. S. 293 (1963)). It has witnessed, as well, the execution of two victims of the "new habeas," Warren McCleskey and Roger Keith Coleman.

Warren McCleskey's case seemed the archetypal "fundamental miscarriage of justice" that the federal courts are charged with remedying. As noted above, McCleskey dem-

onstrated that state officials deliberately had elicited inculpatory admissions from him in violation of his Sixth Amendment rights and had withheld information he needed to present his claim for relief. In addition, McCleskey argued convincingly in his final hours that he could not even obtain an impartial clemency hearing because of threats by state officials against the pardons and parole board. That the Court permitted McCleskey to be executed without ever hearing the merits of his claims starkly reveals the Court's skewed value system, in which finality of judgments, conservation of state resources, and expediency of executions seem to receive greater solicitude than justice and human life. See *McCleskey* v. *Bowers*, 501 U. S. 1281 (1991) (Marshall, J., dissenting from denial of stay of execution).

The execution of Roger Keith Coleman is no less an affront to principles of fundamental fairness. Last Term, the Court refused to review the merits of Coleman's claims by effectively overruling, at Coleman's expense, precedents holding that state-court decisions are presumed to be based on the merits (and therefore, are subject to federal habeas review) unless they explicitly reveal that they were based on state procedural grounds. See *Coleman*, 501 U. S., at 762–764 (dissenting opinion). Moreover, the Court's refusal last month to grant a temporary stay of execution so that the lower courts could conduct a hearing into Coleman's well-supported claim that he was innocent of the underlying offense demonstrates the resounding hollowness of the Court's professed commitment to employ the "fundamental miscarriage of justice exception" as a "safeguard against compelling an innocent man to suffer an unconstitutional loss of liberty." *McCleskey* v. *Zant*, 499 U. S., at 495 (internal quotation marks omitted). See *Coleman* v. *Thompson*, 504 U. S. 188, 189 (1992) (opinion dissenting from denial of stay of execution).

As I review the state of this Court's capital jurisprudence, I thus am left to wonder how the ever-shrinking authority of

the federal courts to reach and redress constitutional errors affects the legitimacy of the death penalty itself. Since *Gregg* v. *Georgia,* the Court has upheld the constitutionality of the death penalty where sufficient procedural safeguards exist to ensure that the State's administration of the penalty is neither arbitrary nor capricious. See 428 U. S. 153, 189, 195 (1976) (joint opinion); *Lockett* v. *Ohio,* 438 U. S. 586, 601 (1978). At the time those decisions issued, federal courts possessed much broader authority than they do today to address claims of constitutional error on habeas review and, therefore, to examine the adequacy of a State's capital scheme and the fairness and reliability of its decision to impose the death penalty in a particular case. The more the Court constrains the federal courts' power to reach the constitutional claims of those sentenced to death, the more the Court undermines the very legitimacy of capital punishment itself.

JUSTICE STEVENS, with whom JUSTICE BLACKMUN and JUSTICE O'CONNOR join, concurring in the judgment.

Only 10 years ago, the Court reemphasized that "[t]he writ of habeas corpus indisputably holds an honored position in our jurisprudence. Tracing its roots deep into English common law, it claims a place in Art. I of our Constitution. Today, as in prior centuries, the writ is a bulwark against convictions that violate 'fundamental fairness.' *Wainwright* v. *Sykes,* 433 U. S. [72,] 97 [(1977)] (STEVENS, J., concurring)." *Engle* v. *Isaac,* 456 U. S. 107, 126 (1982). It is this centrality of "fundamental fairness" that has led the Court to hold that habeas review of a defaulted, successive, or abusive claim is available, even absent a showing of cause, if failure to consider the claim would result in a fundamental miscarriage of justice. See *Sanders* v. *United States,* 373 U. S. 1, 17–18 (1963); *Engle,* 456 U. S., at 135.

In *Murray* v. *Carrier,* 477 U. S. 478, 495, 496 (1986), the Court ruled that the concept of "fundamental miscarriage of justice" applies to those cases in which the defendant was

"probably . . . actually innocent." The Court held that "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Id.*, at 496. Having equated the "ends of justice" with "actual innocence," the Court is now confronted with the task of giving meaning to "actual innocence" in the context of a capital sentencing proceeding—hence the phrase "innocence of death."

While the conviction of an innocent person may be the archetypal case of a manifest miscarriage of justice, it is not the only case. There is no reason why "actual innocence" must be both an animating *and the limiting* principle of the work of federal courts in furthering the "ends of justice." As Judge Friendly emphasized, there are contexts in which, irrespective of guilt or innocence, constitutional errors violate fundamental fairness. Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 151–154 (1970). Fundamental fairness is more than accuracy at trial; justice is more than guilt or innocence.

Nowhere is this more true than in capital sentencing proceedings. Because the death penalty is qualitatively and morally different from any other penalty, "[i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, the consequence of scrupulously fair procedures." *Smith* v. *Murray*, 477 U. S. 527, 545–546 (1986) (STEVENS, J., dissenting). Accordingly, the ends of justice dictate that "[w]hen a condemned prisoner raises a substantial, colorable Eighth Amendment violation, there is a special obligation . . . to consider whether the prisoner's claim would render his sentencing proceeding fundamentally unfair." *Id.*, at 546.

Thus the Court's first and most basic error today is that it asks the wrong question. Charged with averting manifest miscarriages of justice, the Court instead narrowly recasts

its duty as redressing cases of "actual innocence." This error aside, under a proper interpretation of the *Carrier* analysis, the Court's definition of "innocence of death" is plainly wrong because it disregards well-settled law—both the law of habeas corpus and the law of capital punishment.

## I

The Court today holds that, absent a showing of cause, a federal court may not review a capital defendant's defaulted, successive, or abusive claims unless the defendant

> "show[s] by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found [him] eligible for the death penalty." *Ante*, at 336.

This definition of "innocence of the death sentence" deviates from our established jurisprudence in two ways. First, the "clear and convincing evidence" standard departs from a line of decisions defining the "actual innocence" exception to the cause-and-prejudice requirement. Second, and more fundamentally, the Court's focus on *eligibility* for the death penalty conflicts with the very structure of the constitutional law of capital punishment.

As noted above, in *Murray* v. *Carrier*, the Court held that in those cases in which "a constitutional violation has *probably* resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." 477 U. S., at 496 (emphasis added). The Court has since frequently confirmed this standard. See, *e. g., Coleman* v. *Thompson*, 501 U. S. 722, 748 (1991); *Dugger* v. *Adams*, 489 U. S. 401, 412, n. 6 (1989); *Teague* v. *Lane*, 489 U. S. 288, 313 (1989). In subsequent decisions, both those involving "innocence of the offense" and those involving "innocence of the death sentence," the Court has employed the same standard of proof. For example, in *Smith* v. *Murray*, 477 U. S. 527

(1986), the Court repeated the *Carrier* standard and applied it in a capital sentencing proceeding. The Court ruled that Smith's claim did not present "the risk of a manifest miscarriage of justice" as it was "devoid of any substantial claim that the alleged error undermined the accuracy of the guilt or sentencing determination." 477 U. S., at 538–539. Similarly, in *Dugger* v. *Adams*, a case involving "innocence of the death sentence," the Court stated the controlling standard as whether an "individual defendant *probably* is 'actually innocent' of the sentence he or she received." 489 U. S., at 412, n. 6 (emphasis added). In sum, in construing both "innocence of the offense" and "innocence of the death sentence," we have consistently required a defendant to show that the alleged constitutional error has *more likely than not* created a fundamental miscarriage of justice.

As we noted in another context, "[t]his outcome-determinative standard has several strengths. It defines the relevant inquiry in a way familiar to courts, though the inquiry, as is inevitable, is anything but precise. The standard also reflects the profound importance of finality in criminal proceedings. Moreover, it comports with the widely used standard for assessing motions for new trial based on newly discovered evidence." *Strickland* v. *Washington*, 466 U. S. 668, 693–694 (1984).

Equally significant, this "probably resulted" standard is well calibrated to the manifest miscarriage of justice exception. Not only does the standard respect the competing demands of finality and fundamental fairness, it also fits squarely within our habeas jurisprudence. In general, a federal court may entertain a defaulted, successive, or abusive claim if a prisoner demonstrates cause and prejudice. See generally *McCleskey* v. *Zant*, 499 U. S. 467, 493–495 (1991). To show "prejudice," a defendant must demonstrate "a reasonable probability that, but for [the alleged] erro[r], the result of the proceeding would have been different." *Strickland*, 466 U. S., at 694; see also *United States* v. *Bag-*

*ley,* 473 U. S. 667, 682, 685 (1985). The "miscarriage of justice" exception to this general rule requires a more substantial showing: The defendant must not simply demonstrate a *reasonable probability* of a different result, he must show that the alleged error *more likely than not* created a manifest miscarriage of justice. This regime makes logical sense. If a defendant cannot show cause and can only show a "reasonable probability" of a different outcome, a federal court should not hear his defaulted, successive, or abusive claim. Only in the "exceptional case" in which a defendant can show that the alleged constitutional error "probably resulted" in the conviction (or sentencing) of one innocent of the offense (or the death sentence) should the court hear the defendant's claim.

The Court today repudiates this established standard of proof and replaces it with a requirement that a defendant "show by *clear and convincing evidence* that . . . no reasonable juror would have found [him] eligible for the death penalty." *Ante,* at 336 (emphasis supplied). I see no reason to reject the established and well-functioning "probably resulted" standard and impose such a severe burden on the capital defendant. Although we have frequently recognized the State's strong interest in finality, we have never suggested that that interest is sufficient to outweigh the individual's claim to innocence. To the contrary, the "actual innocence" exception itself manifests our recognition that the criminal justice system occasionally errs and that, when it does, finality must yield to justice.

"The function of a standard of proof . . . is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.' . . . The standard serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision." *Addington* v. *Texas,* 441 U. S. 418, 423 (1979) (citation omitted). Neither of these considerations

supports the heightened standard of proof the Court imposes today.

First, there is no basis for requiring a federal court to be virtually certain that the defendant is actually ineligible for the death penalty before *merely entertaining* his claim. We have required a showing by clear and convincing evidence in several contexts: For example, the medical facts underlying a civil commitment must be established by this standard, *Addington* v. *Texas*, 441 U. S. 418 (1979), as must "actual malice" in a libel suit brought by a public official. *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 279–280 (1964); see also *Anderson* v. *Liberty Lobby, Inc.*, 477 U. S. 242 (1986). And we have required a related showing in cases involving deportation, *Woodby* v. *INS*, 385 U. S. 276, 285–286 (1966), and denaturalization, *Schneiderman* v. *United States*, 320 U. S. 118, 125 (1943). In each of these contexts, the interests of the nonmoving party were truly substantial: personal liberty in *Addington*, freedom of expression in *New York Times*, residence in *Woodby*, and citizenship in *Schneiderman*. In my opinion, the State's interest in finality in a capital prosecution is not nearly as great as any of these interests. Indeed, it is important to remember that "innocence of the death sentence" is not a standard for staying or vacating a death sentence, but merely a standard for determining whether or not a court should reach the merits of a defaulted claim. The State's interest in "finality" in this context certainly does not warrant a "clear and convincing" evidentiary standard.

Nor is there any justification for allocating the risk of error to fall so severely upon the capital defendant or attaching greater importance to the initial sentence than to the issue of whether that sentence is appropriate. The States themselves have declined to attach such weight to capital sentences: Most States provide plain-error review for defaulted claims in capital cases. See *Smith* v. *Murray*, 477 U. S., at 548–550, n. 20 (collecting authorities). In this regard, the

Court's requirement that "innocence of death" must be demonstrated by "clear and convincing evidence" fails to respect the uniqueness of death penalty decisions: Nowhere is the need for accuracy greater than when the State exercises its ultimate authority and takes the life of one of its citizens.

Indeed, the Court's ruling creates a perverse double standard. While a defendant raising defaulted claims in a noncapital case must show that constitutional error "probably resulted" in a miscarriage of justice, a capital defendant must present "clear and convincing evidence" that no reasonable juror would find him eligible for the death penalty. It is heartlessly perverse to impose a more stringent standard of proof to avoid a miscarriage of justice in a capital case than in a noncapital case.

In sum, I see no reason to depart from settled law, which clearly requires a defendant pressing a defaulted, successive, or abusive claim to show that a failure to hear his claim will "probably result" in a fundamental miscarriage of justice. In my opinion, a corresponding standard governs a defaulted, successive, or abusive challenge to a capital sentence: The defendant must show that he is probably—that is, more likely than not—"innocent of the death sentence."

## II

The Court recognizes that the proper definition of "innocence of the death sentence" must involve a reweighing of the evidence and must focus on the sentencer's likely evaluation of that evidence. Thus, the Court directs federal courts to look to whether a "reasonable juror *would* have found the petitioner eligible for the death penalty." *Ante*, at 336 (emphasis added). Nevertheless, the Court inexplicably limits this inquiry in two ways. First, the Court holds that courts should consider *only* evidence concerning aggravating factors. As demonstrated below, this limitation is wholly without foundation and neglects the central role of mitigating evidence in capital sentencing proceedings. Second, the

Court requires a petitioner to refute his *eligibility* for the death penalty. This narrow definition of "innocence of the death sentence" fails to recognize that, in rare cases, even though a defendant is eligible for the death penalty, such a sentence may nonetheless constitute a fundamental miscarriage of justice.

It is well established that, "in capital cases, the sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence." *Hitchcock* v. *Dugger*, 481 U. S. 393, 394 (1987) (internal quotation marks and citations omitted). Yet in ascribing a narrow, eligibility-based meaning to "innocence of the death sentence" the Court neglects this rudimentary principle.

As the Court recognizes, a single general directive animates and informs our capital-punishment jurisprudence: "[T]he death penalty [may not] be imposed under sentencing procedures that creat[e] a substantial risk that [the death penalty] would be inflicted in an arbitrary and capricious manner." *Gregg* v. *Georgia*, 428 U. S. 153, 188 (1976) (opinion of Stewart, Powell, and STEVENS, JJ.). As applied and developed over the years, this constitutional requirement has yielded two central principles. First, a sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty." *Zant* v. *Stephens*, 462 U. S. 862, 877 (1983). Second, the sentencer must "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett* v. *Ohio*, 438 U. S. 586, 604 (1978) (opinion of Burger, C. J.) (emphasis in original). Although these principles—one narrowing the relevant class, the other broadening the scope of considered evidence—seemingly point in opposite directions, in fact both serve the same end: ensuring that a capital sentence is the product of individualized and reasoned moral decisionmaking.

Against this backdrop of well-settled law, the Court's ruling is a startling anomaly. The Court holds that "innocence of the death sentence" concerns only "those elements that render a defendant *eligible* for the death penalty, and *not* ... *additional mitigating evidence* that [constitutional error precluded] from being introduced." *Ante*, at 347 (emphasis added). Stated bluntly, the Court today respects only one of the two bedrock principles of capital-punishment jurisprudence. As such, the Court's impoverished vision of capital sentencing is at odds with both the doctrine and the theory developed in our many decisions concerning capital punishment.

First, the Court implicitly repudiates the requirement that the sentencer be allowed to consider all relevant mitigating evidence, a constitutive element of our Eighth Amendment jurisprudence. We have reiterated and applied this principle in more than a dozen cases over the last 14 years. For example, in *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982), we overturned a capital sentence because the sentencer refused to consider certain mitigating evidence. Similarly, in *Skipper* v. *South Carolina*, 476 U. S. 1 (1986), we ruled that a State cannot preclude consideration of evidence of postincarceration, pretrial good behavior. And in *Penry* v. *Lynaugh*, 492 U. S. 302 (1989), we held that Texas' death penalty scheme impermissibly restricted the jury's consideration of the defendant's mental retardation as mitigating evidence.[1]

Moreover, the Court's holding also clashes with the *theory* underlying our capital-punishment jurisprudence. The nonarbitrariness—and therefore the constitutionality—of the death penalty rests on *individualized* sentencing determinations. See generally *California* v. *Brown*, 479 U. S. 538, 544–546 (1987) (O'CONNOR, J., concurring). This is the dif-

---

[1] See also *Boyde* v. *California*, 494 U. S. 370 (1990); *McKoy* v. *North Carolina*, 494 U. S. 433 (1990); *Franklin* v. *Lynaugh*, 487 U. S. 164 (1988); *Mills* v. *Maryland*, 486 U. S. 367 (1988); *Hitchcock* v. *Dugger*, 481 U. S. 393 (1987); *Bell* v. *Ohio*, 438 U. S. 637 (1978).

ference between the guided-discretion regime upheld in *Gregg* v. *Georgia* and the mandatory death-sentence regime invalidated in *Roberts* v. *Louisiana,* 428 U. S. 325 (1976). The *Roberts* scheme was constitutionally infirm because it left no room for individualized moral judgments, because it failed to provide the sentencer with a "meaningful opportunity [to] conside[r the] mitigating factors presented by the circumstances of the particular crime or by the attributes of the individual offender." *Id.,* at 333–334 (opinion of Stewart, Powell, and STEVENS, JJ.). The Court's definition of "innocence of the death sentence" is like the statutory scheme in *Roberts:* It focuses solely on whether the defendant is in a class eligible for the death penalty and disregards the equally important question whether "'death is the appropriate punishment in [the defendant's] specific case.'" *Zant* v. *Stephens,* 462 U. S., at 885 (quoting *Woodson* v. *North Carolina,* 428 U. S. 280, 305 (1976)).[2]

The Court's definition of "innocent of the death sentence" is flawed in a second, related way. The Court's analysis not only neglects errors that preclude a sentencer's consideration of mitigating factors; it also focuses too narrowly on *eligibility.* The Court requires a defendant to call into question *all* of the aggravating factors found by the sentencer and thereby show himself ineligible for the death penalty.

---

[2] The Court rejects the argument that federal courts should also consider *mitigating* evidence because consideration of such evidence involves the "far more difficult task [of] assess[ing] how jurors would have reacted to additional showings." *Ante,* at 346. I see no such difference between consideration of aggravating and mitigating circumstances; both require the federal courts to reconsider and anticipate a sentencer's decision: By the Court's own standard federal courts must determine whether a "reasonable juror would have found" certain facts. Thus, the Court's reason for barring federal courts from considering mitigating circumstances applies equally to the standard that *it* endorses. Its exclusion of mitigating evidence from consideration is therefore wholly arbitrary.

Contrary to the Court's suggestion, however, there may be cases in which, although the defendant remains eligible for the death penalty, imposition of a death sentence would constitute a manifest miscarriage of justice. If, for example, the sentencer, in assigning a sentence of death, relied heavily on a finding that the defendant severely tortured the victim, but later it is discovered that another person was responsible for the torture, the elimination of the aggravating circumstance will, in some cases, indicate that the death sentence was a miscarriage of justice. By imposing an "all-or-nothing" eligibility test, the Court's definition of "innocent of the death sentence" fails to acknowledge this important possibility.

In sum, the Court's "innocent of the death sentence" standard is flawed both in its failure to consider constitutional errors implicating mitigating factors and in its unduly harsh requirement that a defendant's eligibility for the death penalty be disproved.

### III

In my opinion, the "innocence of the death sentence" standard must take into account several factors. First, such a standard must reflect *both* of the basic principles of our capital-punishment jurisprudence. The standard must recognize both the need to define narrowly the class of "death-eligible" defendants and the need to define broadly the scope of mitigating evidence permitted the capital sentencer. Second, the "innocence of the death sentence" standard should also recognize the distinctive character of the capital sentencing decision. While the question of innocence or guilt of the offense is essentially a question of fact, the choice between life imprisonment and capital punishment is both a question of underlying fact and a matter of reasoned moral judgment. Thus, there may be some situations in which, although the defendant remains technically "eligible" for the death sentence, nonetheless, in light of all of the evidence,

that sentence constitutes a manifest miscarriage of justice. Finally, the "innocence of the death sentence" standard must also respect the "profound importance of finality in criminal proceedings," *Strickland* v. *Washington,* 466 U. S., at 693–694, and the "heavy burden" that successive habeas petitions place "on scarce federal judicial resources." *McCleskey* v. *Zant,* 499 U. S., at 491.

These requirements are best met by a standard that provides that a defendant is "innocent of the death sentence" only if his capital sentence is *clearly erroneous.* This standard encompasses several types of error. A death sentence is clearly erroneous if, taking into account all of the available evidence, the sentencer lacked the legal authority to impose such a sentence because, under state law, the defendant was not eligible for the death penalty. Similarly, in the case of a "jury override," a death sentence is clearly erroneous if, taking into account all of the evidence, the evidentiary prerequisites for that override (as established by state law) were not met. See, *e. g., Johnson* v. *Singletary,* 938 F. 2d 1166, 1194–1195 (CA11 1991) (Tjoflat, C. J., concurring in part and dissenting in part) (concluding that the sentencing "judge, as a matter of law, could not have sentenced the petitioner to death" because there was insufficient evidence to meet the jury-override standard established in *Tedder* v. *State,* 322 So. 2d 908, 910 (Fla. 1975)). A death sentence is also clearly erroneous under a "balancing" regime if, in view of all of the evidence, mitigating circumstances so far outweighed aggravating circumstances that no reasonable sentencer would have imposed the death penalty. Cf. *Jackson* v. *Virginia,* 443 U. S. 307, 316–318 (1979). Such a case might arise if constitutional error either precluded the defendant from demonstrating that aggravating circumstances did not obtain or precluded the sentencer's consideration of important mitigating evidence.

Unlike the standard suggested by the Court, this standard acknowledges both the "aggravation" and "mitigation" aspects of capital-punishment law. It recognizes that, in the extraordinary case, constitutional error may have precluded consideration of mitigating circumstances so substantial as to warrant a court's review of a defaulted, successive, or abusive claim. It also recognizes that, again in the extraordinary case, constitutional error may have inaccurately demonstrated aggravating circumstances so substantial as to warrant review of a defendant's claims.

Moreover, the "clearly-erroneous" standard is duly protective of the State's legitimate interests in finality and respectful of the systemic and institutional costs of successive habeas litigation. The standard is stringent: If the sentence "is plausible in light of the record viewed in its entirety" it is not clearly erroneous "even though [the court is] convinced that had it been sitting as the [sentencer], it would have weighed the evidence differently." *Anderson* v. *Bessemer City*, 470 U. S. 564, 574 (1985). At the same time, "clearly-erroneous" review allows a federal court to entertain a defaulted claim in the rare case in which the "court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States* v. *United States Gypsum Co.*, 333 U. S. 364, 395 (1948).

Finally, the "clearly-erroneous" standard is workable. As was true of the cause-and-prejudice standard adopted in *Mc-Cleskey* v. *Zant*, the clear-error standard is "[w]ell-defined in the case law [and] familiar to federal courts. . . . The standard is an objective one, and can be applied in a manner that comports with the threshold nature of the abuse of the writ inquiry." 499 U. S., at 496. Federal courts have long applied the "clearly-erroneous" standard pursuant to Rule 52 of the Federal Rules of Civil Procedure and have done so "in civil contempt actions, condemnation proceedings, copyright appeals, [and] forfeiture actions for illegal activity." 1 S. Childress & M. Davis, Standards of Review § 2.3, pp. 29–30

(1986) (citing cases).[3]   This workability supports the application of the "clearly-erroneous" standard to the "innocence of the death sentence" inquiry.

In my opinion, then, the "clearly-erroneous" standard is the core of the "innocence of the death sentence" exception. Just as a defendant who presses a defaulted, successive, or abusive claim and who cannot show cause must demonstrate that it is more likely than not that he is actually innocent of the offense, so a capital defendant who presses such a claim and cannot show cause must demonstrate that it is more likely than not that his death sentence was clearly erroneous. Absent such a showing, a federal court may not reach the merits of the defendant's defaulted, successive, or abusive claim.

## IV

It remains to apply this standard to the case at hand.   As the majority indicates, Sawyer alleges two constitutional errors.   First, he contends that the State withheld certain exculpatory evidence, in violation of Sawyer's due process rights as recognized in Brady v. Maryland, 373 U. S. 83 (1963).   Second, Sawyer argues that his trial counsel's failure to uncover and present records from Sawyer's earlier treatments in psychiatric institutions deprived him of effective assistance of counsel as guaranteed by the Sixth Amendment.

As Sawyer failed to assert his Brady claim in an earlier habeas petition and as he cannot show cause for that failure, the court may only reach the merits of that "abusive" claim if Sawyer demonstrates that he is probably actually innocent of the offense or that it is more likely than not that his death sentence was clearly erroneous.   As Sawyer's ineffective-assistance claim was considered and rejected in an earlier

---

[3] Courts have also reviewed nonguilt findings of fact made in criminal cases pursuant to Rule 23(c) of the Federal Rules of Criminal Procedure under this standard.   See 2 S. Childress & M. Davis, Standards of Review § 10.3, pp. 73–76 (1986) (citing cases).

habeas proceeding, the court may only review that "successive" claim upon a similar showing. Upon a review of the record in its entirety, I conclude that Sawyer has failed to make such a showing.

Sawyer points to two pieces of exculpatory evidence allegedly withheld by the State. First, he offers the affidavit of a woman (Diane Thibodeaux) who, on occasion, took care of the small child who witnessed the crime. That account appears to conflict with contemporaneous police reports. While police records indicate that the child implicated Sawyer in the cruel burning of the victim, Thibodeaux avers that the child stated to her that Sawyer's codefendant, Charles Lane, set the victim afire. Second, he offers other affidavits casting doubt on the credibility of Cindy Shano, the State's principal witness. Sawyer emphasizes that Shano testified under a grant of immunity and highlights inaccuracies in her trial testimony. Finally, as part of his Sixth Amendment claim, Sawyer also offers medical records documenting brain damage and retarded mental development.

Viewed as a whole, the record does not demonstrate that failure to reach the merits of Sawyer's claims would constitute a fundamental miscarriage of justice. First, in view of the other evidence in the record, the Thibodeaux affidavit and questions concerning Shano's testimony do not establish that Sawyer is "probably . . . actually innocent" of the crime of first-degree murder. At most, Thibodeaux's hearsay statements cast slight doubt on the facts underlying the burning of the victim. Similarly, although the challenges to Shano's testimony raise questions, these affidavits do not demonstrate that Sawyer probably did not commit first-degree murder. Thus, Sawyer has not met the standard "actual innocence" exception.

Second, the affidavits and the new medical records do not convince me that Sawyer's death sentence is clearly erroneous. The jury found two statutory aggravating factors—that the murder was committed in the course of an aggra-

vated arson, and that the murder was especially heinous, atrocious, and cruel. *State* v. *Sawyer,* 422 So. 2d 95, 100 (La. 1982). As suggested above, the Thibodeaux affidavit does not show that it is "more likely than not" that Sawyer did not commit aggravated arson. Moreover, Sawyer offers no evidence to undermine the jury's finding that the murder was especially heinous, atrocious, and cruel. In addition, assuming that the new medical evidence would support a finding of a statutory mitigating factor (diminished capacity due to mental disease or defect),[4] I cannot say that it would be clear error for a sentencer faced with the two unrefuted aggravating circumstances and that single mitigating circumstance to sentence Sawyer to death.

In sum, in my opinion Sawyer has failed to demonstrate that it is more likely than not that his death sentence was clearly erroneous. Accordingly, I conclude that the court below was correct in declining to reach the merits of Sawyer's successive and abusive claims.

## V

The Court rejects an "innocence of death" standard that recognizes constitutional errors affecting *mitigating* evidence because such a standard "would so broaden the inquiry as to make it anything but a 'narrow' exception to the principle of finality." *Ante,* at 345. As the foregoing analysis indicates, however, the Court's concerns are unfounded. Indeed, even when federal courts have applied a less restrictive standard than the standard I propose, those courts have rarely found "innocence of death" and reached the merits of a defaulted, successive, or abusive claim. See *Deutscher* v. *Whitley,* 946 F. 2d 1443 (CA9 1991); *Stokes* v.

---

[4] See La. Code Crim. Proc. Ann., Art. 905.5(e) (West 1984) (defining "mitigating circumstances" to include the fact that "the capacity of the offender to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect" at the time of the offense).

*Armontrout,* 893 F. 2d 152, 156 (CA8 1989); *Smith* v. *Armontrout,* 888 F. 2d 530, 545 (CA8 1989).

Similarly, I do not share the Court's concern that a standard broader than the eligibility standard creates "a far more difficult task" for federal courts. *Ante,* at 346. As noted above, both the "probably resulted" standard and the "clearly-erroneous" standard have long been applied by federal courts in a variety of contexts. Moreover, to the extent that the "clearly-erroneous" standard is more difficult to apply than the Court's "eligibility" test, I believe that that cost is far outweighed by the importance of making just decisions in the few cases that fit within this narrow exception. To my mind, any added administrative burden is surely justified by the overriding interest in minimizing the risk of error in implementing the sovereign's decision to take the life of one of its citizens. As we observed in *Gardner* v. *Florida,* 430 U. S. 349, 360 (1977), "if the disputed matter is of critical importance, the time invested in ascertaining the truth would surely be well spent if it makes the difference between life and death."