912 F.Supp. 448 (1995)
Lloyd SCHLUP, Petitioner,
v.
Paul DELO, Superintendent Potosi Correctional Center, Respondent.
No. 4:92CV443.
United States District Court, E.D. Missouri, Eastern Division.
December 8, 1995.
*449 Sean D. O'Brien, Kris T. Daniel, Missouri Capital Punishment Resource Center, Kansas City, MO, for petitioner.
Frank A. Jung, Attorney General of Missouri, Assistant Attorney General, Jefferson City, MO, for Paul Delo.
Stephen D. Hawke, Attorney General of Missouri, Assistant Attorney General, Jefferson City, MO, Denise G. McElvein, Attorney General of Missouri, Assistant Attorney General, St. Louis, MO, for Michael Bowersox.

MEMORANDUM AND ORDER
HAMILTON, Chief Judge.
This matter is before the Court on remand from the Eighth Circuit Court of Appeals. In an Order entered August 23, 1993, this Court denied the petition of Lloyd Schlup for writ of habeas corpus on grounds that Petitioner failed to show cause for failing to raise his new claims previously. The Court also held that Petitioner failed to satisfy the "actual innocence" standard set forth in Sawyer v. Whitley, 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992) for showing that "a fundamental miscarriage of justice would result from failure to entertain the claim." The Eighth Circuit affirmed. Schlup v. Delo, 11 F.3d 738 (8th Cir.1993). Petitioner appealed to the United States Supreme Court which granted certiorari to consider the applicability of the Sawyer standard to Petitioner's claims.
In Schlup v. Delo, ___ U.S. ___, ___, 115 S.Ct. 851, 867, 130 L.Ed.2d 808 (1995), the Supreme Court held that the "[Murray v. Carrier, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)] `probably resulted' standard rather than the more stringent Sawyer standard must govern the miscarriage of justice inquiry when a petitioner who has been sentenced to death raises a claim of actual innocence to avoid a procedural bar to the consideration of the merits of the constitutional claims." Id. at ___, 115 S.Ct. at 867. The Court explained that the Carrier standard requires a petitioner to establish that "`a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" Id. (quoting Carrier, 477 U.S. at 496, 106 S.Ct. at 2649).
At the conclusion of the Schlup opinion, the Court stated that
[t]he fact intensive nature of the inquiry, together with the District Court's ability to take testimony from the few key witnesses if it deems that course advisable, convinces us that the most expeditious procedure is to order that the decision of the Court of Appeals be vacated and that the case be remanded to the Court of Appeals with instructions to remand to the District Court for further proceedings consistent with this opinion.
Id. at ___, 115 S.Ct. at 869. In view of the Schlup opinion, the Court conducted an evidentiary hearing the week of November 20, 1995[1] to assist the Court in analyzing Petitioner's claim of actual innocence which he asserts as a means to overcome the procedural bar to the Court's consideration of the merits of his claims for habeas relief.

ANALYSIS
Petitioner filed his initial petition on or about March 11, 1992.[2] Petitioner asserts the following seven claims in support of his petition: (1) Petitioner has newly discovered evidence that establishes his innocence of the murder;[3] (2) trial counsel was ineffective *450 because he failed to interview or call as witnesses several individuals who could have testified that Petitioner was not present at the scene of the murder; (3) trial counsel was ineffective because he failed to investigate, rebut, and object to the testimony of state's key witnesses; (4) the prosecution failed to disclose material exculpatory evidence concerning Petitioners' involvement in the murder; (5) trial counsel failed to conduct a reasonable investigation into Petitioner's background and mental health; (6) trial counsel was ineffective because he failed to conduct an investigation into the facts and circumstances of the aggravating circumstances presented during the penalty phase of the trial; and (7) the prosecution failed to disclose exculpatory evidence concerning the aggravating circumstances. Petitioner's claims 1, 3, 4, 6, and 7 were raised for the first time in the initial petition filed with this Court (hereinafter "the new claims"). Petitioner raised claims 2 and 5 in his first petition for habeas relief (hereinafter "the successive claims"). In previously considering the instant petition for habeas relief, the Court determined that review of Petitioner's new and successive claims was procedurally barred. Additionally, the Court determined that Petitioner failed to establish cause and prejudice with respect to claims 1, 3, 4, 6, and 7. (August 23, 1993 Order, p. 7). The Court also determined that Petitioner failed to satisfy the Sawyer v. Whitley, 505 U.S. 333, 349, 112 S.Ct. 2514, 2524, 120 L.Ed.2d 269 (1992), actual innocence standard with respect both to Petitioner's new and successive claims. As discussed above, the Supreme Court held that the appropriate standard to be applied in this type of case is not found in Sawyer, but in Murray v. Carrier, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Accordingly, the Supreme Court remanded this case so that the Court could consider Petitioner's claim of actual innocence under the Carrier standard.[4]
For the Court to reach the merits of Petitioner's claims for habeas relief, the Court must find that, considering all of the evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Schlup v. Delo, ___ U.S. ___, ___, 115 S.Ct. 851, 867, 130 L.Ed.2d 808 (1995). In making that determination, the Court may consider
`all evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after trial.'
Schlup, ___ U.S. at ___, 115 S.Ct. at 867 (quoting Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U.Chi.L.Rev. 142, 160 (1970)).

A. New Evidence
Petitioner presents as new evidence the testimony of several eyewitnesses attesting to Petitioner's innocence. Additionally, Petitioner presents the testimony of Robert Faherty and John Green whose statements call into question whether Petitioner could have participated in the murder of Arthur Dade and still arrived in the dining room just over a minute before the distress call was received. After considering this evidence, the Court finds the testimony of the eyewitnesses credible and believable. The Court also finds the testimony of Faherty and Green believable. Accordingly, the Court *451 concludes that "it cannot be said that a juror, conscientiously following the judge's instructions requiring proof beyond a reasonable doubt, would vote to convict." Schlup, ___ U.S. at ___, 115 S.Ct. at 869. Below, the Court discusses the specific evidence upon which it bases its finding that Petitioner has satisfied the actual innocence standard clarified in Schlup.

I. Eyewitness Accounts
On February 3, 1984, Arthur Dade, an inmate at the Missouri State Penitentiary (hereinafter "MSP"), was stabbed to death on Walk I of the super maximum security area of MSP. The following individuals witnessed the stabbing and attest to Petitioner's innocence of that crime. Respondent attempts to undermine the credibility of each of these witnesses by highlighting the crimes for which they are incarcerated. The Court finds the testimony of the following individuals credible in spite of their criminal histories.

A. Ricky McCoy
Ricky McCoy witnessed the murder of Arthur Dade on February 3, 1984. At the November 20, 1995 hearing, he testified that he saw Robert O'Neal and a "smaller guy named Rocky," Randy Jordan, participate in the murder. He also saw a third person with a slim build at the scene. Although McCoy could not identify the third individual, he testified that Petitioner was not at the scene of the crime.
Following the murder, prison investigators George Brooks and Arthur Dearixon interviewed McCoy. McCoy told investigators that O'Neal had been involved in Dade's murder. McCoy, however, did not mention "Rocky." McCoy testified that in cooperating with the investigators, he felt that he had blemished his reputation. He explained that inmates have a "code of silence" and that by identifying the individuals in the murder he could be labeled a "snitch" and become an outcast at the prison. In view of his concerns of being identified as a "snitch," during a February 19, 1984 deposition, McCoy told Petitioner's trial counsel that he did not witness the murder.
Although McCoy has on one occasion stated that he did not view Dade's murder, the Court finds McCoy's testimony reliable. The culture in the prison influenced McCoy's willingness to discuss the murder of Dade in the past. The Court finds McCoy's testimony given on November 20, 1995 credible and believable.

B. James Pierce
James Pierce witnessed the murder of Dade on February 3, 1984. At the November 20, 1995 hearing, Pierce testified that Schlup did not participate in the stabbing. During the investigation of Dade's murder, investigators Brooks and Dearixon interviewed Pierce. At that time, Pierce stated that he did not see anything on the day in question. At the hearing, Pierce explained that he was not forthcoming with the investigators because he did want to be a "rat." Similar to McCoy, Pierce expressed concern that cooperating with the prison investigators would harm his reputation in the prison and place him in a potentially dangerous position. In view of that concern, the Court does not find Pierce's initial unwillingness to discuss the murder to cast doubt on the reliability of his November 20, 1995 testimony.

C. Herbert Chastain (Rodnie Stewart)[5]
Rodnie Stewart was convicted of the murder of Dade and sentenced to life imprisonment without the possibility of parole for fifty years. At the November 20, 1995 hearing, he testified, by way of a video deposition, that Petitioner was not present at the scene of the murder. He further testified that Petitioner was one of the first inmates to leave the housing unit, 5 A, to go to the dining room for lunch.
Following Dade's murder, Stewart was questioned by the Cole County Sheriff and investigator Brooks over the course of several *452 days in June of 1984. Stewart implicated Petitioner in Dade's murder. At the November 20, 1995 hearing, Stewart explained that he only implicated Petitioner because he thought that by doing so the charges against him would be dropped. He testified that he lied to Brooks about Petitioner's involvement in the murder. He testified that he has finally decided to tell the truth about the murder and that he is sorry for lying. Stewart explained that he has not come forward before because he was concerned about himself and his safety.

D. Aaron Phillips
Aaron Phillips witnessed the murder of Dade on February 3, 1984. Phillips testified that he saw the two individuals who were involved in the murder. Phillips, however, refused to identify those individuals at the November 20, 1995 hearing. Phillips testified that he knew the man who had stabbed Dade and that he was not present in the courtroom on November 20, 1995. He clarified that Petitioner was not present at the scene of Dade's murder. When questioned by investigators Brooks and Dearixon, Phillips stated that he did not see anything on the day of the murder. He explained that he did not want to get involved because of the "principle at the time." The Court finds Phillips' testimony credible despite his initial refusal to discuss the murder in view of the prison culture and the "code of silence" which had been referred to by several other inmates who also failed to discuss the murder in 1984.

E. Gary Sonnenberg
Gary Sonnenberg witnessed Dade's murder on February 3, 1984. At the November 20, 1995 hearing, Sonnenberg testified that he saw O'Neal stab Dade. He also testified that Stewart was present at the crime scene. Sonnenberg testified that Petitioner was not involved in Dade's murder and that he did not see Petitioner at the scene.

F. Donnell White
Donnell White witnessed Dade's murder on February 3, 1984. White testified at the November 20, 1995 hearing by way of a videotaped deposition. White testified that he saw two individuals participate in Dade's murder. He identified one individual as O'Neal. He further testified that he did not see Petitioner in the area of the stabbing. Following the murder in 1984, White told investigators Brooks and Dearixon that he did not see the murder. He explained that in the penitentiary "you didn't see nothing (sic), you didn't know nothing (sic)." White explained that he wanted to discuss the murder in 1984, but that he knew that "guys don't usually ... say nothin' if they see somethin' in the penitentiary." (White depo., p. 8)

G. Joe Beck
Joe Beck witnessed the murder of Arthur Dade on February 3, 1984. Beck testified by way of a videotaped deposition at that November 20, 1995 hearing. Beck testified that he saw the individual who stabbed Dade. He refused to identify the individual who he saw stab Dade stating that it is not relevant to whether Schlup participated in the murder. He further explained that there was "some risk involved" in identifying the murderer. Although Beck would not name the individual involved in Dade's murder, he testified that Petitioner was not present.
Following the murder in 1984, investigators Brooks and Dearixon interviewed Beck regarding Dade's murder. At that time, Beck told investigators that he did not know anything about Dade's murder. Beck explained that he did not cooperate with investigators because it was not his responsibility to tell them anything. He further stated that he did not discuss the murder with investigators because he "had to live" in the penitentiary.

H. Jack Babbcock
Jack Babbcock witnessed Dade's murder on February 3, 1984. Babbock testified at the November 20, 1995 hearing. Babbcock testified that on February 3, 1984, he saw Petitioner going down the stairs to lunch. He stated that Petitioner was approximately four or five people ahead of him on the stairs. Babbcock witnessed the murder as he was descending the stairs in the center of housing *453 unit 5A. He testified that he recognized the individuals that participated in the murder. However, Babbcock was unwilling to identify the individuals involved in the murder. Babbcock explained that he had been in prison for fifty years and that he did not want to get involved because he has to live there "day and night." Babbcock testified that Petitioner was not present at the murder.

I. Emmett Nave
Emmett Nave witnessed the murder of Arthur Dade on February 3, 1984. Nave testified at the November 20, 1995 hearing by way of a videotaped deposition. Nave testified that on February 3, 1984, Petitioner was ahead of him on the stairs on the way to the dining room. Nave witnessed Dade' murder from the bottom of the housing unit stairs. He testified that Petitioner "was not around, couldn't have been." Nave was not willing to identify the individuals he saw participate in Dade's murder. He explained that he "might be killed for that."
Nave also testified that he saw Petitioner in the corridor on the way to the dining hall and that he saw Petitioner stop and holler out of a window. Nave further testified that an officer "hollered at Schlup and told him to move along. He did and went towards the dining hall." Nave stated that the individuals that had stabbed Dade entered the dining hall after Nave and that they had blood on their clothing.

J. Roscoe Thomas
Roscoe Thomas witnessed Dade's murder on February 3, 1984. He testified at the November 20, 1995 hearing by way of a videotaped deposition. Thomas testified that he witnessed Dade's murder and that he "know[s] for a fact that Schlup didn't have anything to do with the killing." (Thomas depo., p. 9) He further stated that if he attested to Petitioner's innocence and Petitioner had actually been involved in Dade's murder, he would "probably get killed." Id. at 10. Similar to other inmates who witnessed Dade's murder, immediately following the incident, Thomas stated that he had not seen the murder. Thomas explained that he did not want to give a statement because of threats that had been issued against him.
The Court finds the testimony of the eyewitnesses to Dade's murder credible and believable. Although most of the inmates interviewed by investigators in 1984 denied having witnessed the murder, those witnesses satisfactorily explained that denial. The above testimony makes clear that a "code of silence" existed in MSP and that inmates respected that code. Moreover, the testimony reveals that failure to adhere to the code can place an inmate in danger. Therefore, the inmates' initial silence regarding the murder of Arthur Dade does not cast doubt on the veracity the inmates' emphatic testimony that Petitioner was not present at the scene of Dade's murder. Additionally, although the details of the eyewitnesses' accounts are somewhat inconsistent, the testimony is unanimous in that all of the eyewitnesses testified that Petitioner was not present at Dade's murder. The eyewitnesses' unanimous testimony that Petitioner was not present at the scene of Dade's murder supports Petitioner's claim of actual innocence.

II. Time Frame Witnesses
In addition to the eyewitness accounts, the following evidence buttresses Petitioner's claim of actual innocence by casting serious doubt on the ability of Petitioner to have participated in the stabbing death of Arthur Dade and to have arrived in the dining room approximately sixty-five seconds before the distress call was sounded. At trial, and at the November 20, 1995 hearing, Petitioner relied on a videotaped recording from a camera located in the dining facility. The tape showed that Petitioner entered the dining room first for the noon meal on February 3, 1984. Roughly thirty-five seconds later, Lieutenant Robert Faherty enters the dining room. Approximately sixty-five seconds after Petitioner entered the dining room, several guards ran out of the dining room. Roughly twenty-six seconds thereafter, O'Neal entered the dining room. He was running and had his hand wrapped up. The testimony of the following witnesses supports Petitioner's theory that he could not have participated in the murder of Dade because *454 he was in the dining room over a minute before the distress call was received. The following testimony of Robert Faherty and John Green was not available at Petitioner's trial.[6]

A. Robert Faherty
Robert Faherty was a zone lieutenant at MSP on February 3, 1984. He testified at the November 20, 1995 hearing. At lunch time on February 3, 1984, Faherty was stationed at the T3 door in the corridor leading to the dining area for a short time. During that time, he saw Petitioner walk down the corridor in the direction of the dining room. He testified that Petitioner was leading the single file line of inmates that was proceeding down the hallway toward the dining room. Faherty observed Petitioner stop and yell out of a broken window. Faherty called Petitioner out of the window, "shook him down," and then sent Petitioner on to the dining room. Faherty testified that Petitioner's behavior was not suspicious and that Petitioner was not perspiring, breathing hard, or exhibiting other signs of physical exertion.
Faherty testified on behalf of the state at Petitioner's trial. Faherty, however, was not questioned regarding "the significant details of his encounter with Schlup" to which he testified at the November 20, 1995 hearing. See, Schlup, ___ U.S. at ___ n. 25, 115 S.Ct. at 859 n. 25. Faherty testified that at the time of Petitioner's trial, he was aware that Petitioner had been the first person out of housing unit 5A, but that he "wasn't seeing the whole picture." He stated that it was not his job to investigate Dade's murder, and that as a prison employee, he believed what he was told to believe.
Several years after Petitioner's trial, in November of 1993, after reading an article about Petitioner in a Columbia, Missouri newspaper, Faherty contacted Petitioner's attorney, Sean O'Brien. Faherty testified that he contacted O'Brien because he knows Petitioner is not guilty of Dade's murder because it is not possible for Petitioner to have been the first person out of housing unit 5A and to have been a participant in the crime. Faherty explained that he now believes in Petitioner's innocence because he can see the "whole picture." He stated that his point of view has changed in part because he is no longer an employee of the Missouri Department of Corrections. Faherty was terminated from his position with the Department of Corrections in 1989.
The Court finds Faherty to be both a credible and believable witness. Despite Faherty's termination from the Missouri Department of Corrections, the Court has no reason to doubt the veracity of Faherty's testimony. Faherty's testimony calls into question Petitioner's ability to have been involved in Dade's murder. Dade's murder occurred on Walk I of housing unit 5A. Petitioner's cell was on Walk II. At the time officers responded to the distress call, Petitioner had been in the dining room for over sixty seconds. To reach the dining room Petitioner had to exit his cell, proceed to the stairway, descend a long flight of stairs, pass through a 290-foot hallway, pass through a sixty-foot hallway, and then descend two flights of stairs. Faherty's testimony indicates that Petitioner could not have participated in Dade's murder and arrive first in the dining room.

B. John Green
John Green was a clerk in housing unit 5A on February 3, 1984.[7] Green testified at the November 20, 1995 hearing regarding the timing of the distress call in relation to Dade's murder. Green testified that at lunch time on February 3, 1984, he was working in housing unit 5A. He saw Sergeant Flowers pull the lever to open the inmates' cells on the A side of Walk II to release the inmates for the noon meal. Green then observed Flowers proceed to the B side. Green next heard a commotion and looked out of the door of the clerk's office where he had been working. Green could plainly see Walk I. Green witnessed Dade's murder. "Within seconds" after Dade collapsed to the floor, *455 Green called base to report the disturbance. To contact base, Green only had to dial a three digit number. Green further testified that Petitioner was not in the vicinity of Dade's murder.
Donald Dunlap testified at the November 20, 1995 hearing regarding Green's credibility. Dunlap is a professional polygraphist who administered a polygraph to Green in November of 1993. The examination consisted of three questions including whether Petitioner had participated in Dade's murder, was at the scene, and whether Green immediately called base. Green responded that Petitioner had not participated in the murder, Petitioner was not present at the murder scene, and that Green immediately called base. Dunlap testified that he found no deception in Green's responses. Although Dunlap's testimony bolsters Green's credibility, the Court finds Green to be a credible, believable witness even in the absence of the polygraph testimony. Green's testimony calls into questions Petitioner's ability to have participated in the murder and to have arrived in the lunch room over one minute before the officers responded to the distress call.
After consideration of all of the materials presented to the Court on the actual innocence issue, the Court concludes that "it is more likely than not that no reasonable juror would have convicted [Petitioner] in light of the new evidence." See Schlup, ___ U.S. at ___, 115 S.Ct. at 867. Accordingly, the Court may reach the merits of Petitioner's claims. The Court, however, will address such claims following a hearing to be held at 9:00 a.m. on January 26, 1996. The Court directs the parties to submit to the Court the following materials on or before January 5, 1996: (1) witness lists including whether the witness will testify live or by way of a deposition, a brief synopsis of each witnesses' testimony, a brief statement explaining the relevance of that testimony, and an explanation of why such evidence is not cumulative; (2) exhibit lists including a brief statement explaining the relevance of such exhibit and why it is not cumulative; (3) briefs addressing the merits of Petitioner's constitutional claims; and (4) any depositions of witnesses whose testimony will be presented in such fashion. Any responses thereto must be submitted on or before January 10, 1996. Accordingly,
IT IS HEREBY ORDERED that Petitioner's Motion for Leave to File a First Amended Petition [docket # 98] is DENIED.
IT IS FURTHER ORDERED that Petitioner's Petitioner for Writ of Habeas Corpus is set for a hearing at 9:00 a.m. on January 26, 1996.
IT IS FURTHER ORDERED that the parties submit to the Court the following information on or before January 5, 1996: (1) witness lists including whether the witness will testify live or by way of a deposition, a brief synopsis of each witnesses' testimony, a brief statement explaining the relevance of that testimony, and an explanation of why such evidence is not cumulative; (2) exhibit lists including a brief statement explaining the relevance of such exhibit and why it is not cumulative; (3) briefs addressing the merits of Petitioner's constitutional claim; and (4) any depositions of witnesses whose testimony will be presented in such fashion. Any responses thereto must be submitted on or before January 10, 1996.
NOTES
[1] The hearing commenced the morning of November 20, 1995 and concluded at approximately 11:00 a.m. on November 22, 1995. For convenience, the Court will refer to the entire hearing as the November 20, 1995 hearing.
[2] Petitioner has filed leave to file a First Amended Petition. In the First Amended Petition, Petitioner asserts no new claims. Rather, he asserts the same claims as those raised in his original petition and merely incorporates into that petition evidence and information that has been introduced into the record subsequent to the filing of Petitioner's original petition. Because the information which Petitioner includes in his proposed first amended petition is already in the record, the Court finds it unnecessary to permit Plaintiff leave to file a first amended petition. Accordingly, the Court will deny Petitioner's Motion for Leave to File a First Amended Petition. The Court will, however, consider Petitioner's First Amended Petition as a supplement to his original petition only to the extent that the First Amended Petition clarifies or adds factual support for the claims raised in Petitioner's Initial Petition. By treating Petitioner's First Amended Petition as a supplement to the original petition, the Court in no way intends to permit Petitioner to raise new claims. To the extent Petitioner raises new claims in his First Amended Petition, the Court will not consider the First Amended Petition as a supplement to the original complaint or otherwise.
[3] This Court and the Eighth Circuit Court of Appeals both rejected Petitioner's substantive claim of actual innocence based on Herrera v. Collins, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). The Supreme Court denied certiorari on that issue. Schlup v. Delo, ___ U.S. ___, ___ n. 31, 115 S.Ct. 851, 861 n. 31, 130 L.Ed.2d 808 (1995). Accordingly, even if Petitioner satisfies the actual innocence standard articulated in Murray v. Carrier, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), the Court will not reconsider the merits of Petitioner's Herrera claim.
[4] In view of the Supreme Court's opinion in Schlup, ___ U.S. ___, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), the Court set this matter for an evidentiary hearing and ordered the parties to brief the actual innocence issue. In his "Brief on the Innocence Standard," Petitioner appears to argue that even if he is unable to satisfy the actual innocence standard, he can show cause and prejudice sufficient to overcome the procedural bar. This Court previously determined that Petitioner could not show cause and prejudice. The Supreme Court did not grant certiorari to consider the issue of cause and prejudice. See Schlup v. Delo, ___ U.S. ___, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). Accordingly, the Court will not reconsider its prior determination that Petitioner has failed to establish cause and prejudice.
[5] Herbert Chastain is also known as Rodnie Stewart. He was convicted of forgery using the name Rodnie Stewart. He was erroneously incarcerated under the name Rodnie Stewart instead of his real name, Herbert Chastain. For clarity, the Court will use the name Rodnie Stewart as this name has been most frequently used throughout the cases involving the murder of Dade.
[6] Although Faherty testified at Petitioner's trial, he was not questioned regarding the "significant details of his encounter with Schlup...." ___ U.S. at ___ n. 25, 115 S.Ct. at 859 n. 25.
[7] John Green was released from prison on January 29, 1986.