Thomas C. BOWLING, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2011–SC–000056–MR.

Supreme Court of Kentucky.

May 24, 2012.

David Michael Barron, Department of Public Advocacy, Assistant Public Advo-

cate, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, William Robert Long, Jr., Assistant Attorney General, Criminal Appellate Division, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice VENTERS.

Appellant, Thomas Clyde Bowling, appeals as a matter of right, Ky. Const. § 110, from a judgment of the Fayette Circuit Court dismissing his petition for a declaratory judgment in which he sought to challenge the implementation of his two twenty-two year-old death sentences upon the grounds that he is mentally retarded. *See Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (prohibiting the execution of a seriously mentally retarded offender); KRS 532.130 *et seq.* (also prohibiting the execution of a seriously mentally retarded offender).

In *Bowling v. Commonwealth,* 163 S.W.3d 361 (Ky.2005) (*Bowling IV*),[1] we addressed this identical argument and concluded that (1) Appellant has procedurally defaulted by waiver any challenge to his death sentences upon the grounds of mental retardation because he failed to raise the issue at trial, on direct appeal, or in any of his subsequent collateral attacks on his judgment and sentence. Considering potential exceptions to the procedural default rule, in *Bowling IV* we further held that: (2) Appellant had failed to demonstrate adequate cause so as to excuse his default; and (3) that under the fundamental miscarriage of justice/actual innocence

exception, failure to consider his claim would not result in a fundamental miscarriage of justice because Appellant had failed to demonstrate a prima facie showing of mental retardation.

As further discussed below, pursuant to *Bowling IV,* it is the law of the case that Appellant has procedurally defaulted on his mental retardation claim and that he has failed to demonstrate adequate cause for his default. It is further, predominantly (except for one *de minimis* omission), the law of the case that Appellant cannot make a prima facie showing that he is able to meet the statutory definition for mental retardation because IQ scores taken around the time of trial reflect that Appellant has an IQ in the 86–87 range, which effectively forecloses any reasonable possibility that he could be found mentally retarded following an evidentiary hearing on the issue. Further, to the extent it is necessary to account for recent changes by the AAMR[2] in its recommended methods for interpreting IQ scores, and to factor the practice effect (the *de minimis* omission referred to above) into the *Bowling IV* analysis, upon a *de novo* re-examination of the issue, we once more conclude that Appellant cannot make a prima facie showing that he is seriously mentally retarded.

Because Appellant's procedural default is dispositive of the case, all other issues raised in this proceeding, including the broader implications of the adoption of new methods for interpreting IQ test score data by the AAMR, are moot; and although Appellant requests us to do so, we

---

1. We refer to the 2005 case as *"Bowling IV"* in recognition that this case was preceded by: (1) Appellant's trial proceedings and direct appeals; (2) his RCr 11.42 proceedings and appeals; and (3) his federal habeas corpus proceedings and appeals. Further, our usage of *"Bowling IV"* is consistent with the terminology applied by the parties.

2. The American Association on Mental Retardation (AAMR). The organization is now the American Association of Intellectual and Developmental Disabilities (AAIDD). In order to maintain continuity with former court decisions, we refer to the organization as AAMR.

decline to further address the arguments raised in this appeal on the merits by method of an advisory opinion. We accordingly affirm the circuit court's judgment dismissing the petition.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On April 9, 1990, Appellant shot and killed Eddie and Tina Earley and wounded their two-year old child. While Appellant was awaiting trial, the legislature amended KRS Chapter 532 to prohibit the execution of a "seriously mentally retarded" offender. *See* KRS 532.130, 532.135, and 532.140; Ky. Acts. 1990 c 488 § 1 (eff. 7–13–90). Therefore, at the time of Appellant's trial, the law in Kentucky was that a death sentence could not be imposed against a seriously mentally retarded offender. Appellant, however, failed to initiate the procedures by which to invoke this prohibition to the death penalty prior to his trial,[3] or to otherwise raise the issue in the trial proceedings.

At the conclusion of a one-week trial in December 1990, Appellant was convicted of two counts of murder and one count of assault in the fourth degree. He was sentenced to death for each of the two murders. His convictions and sentences were affirmed on direct appeal. His subsequent RCr 11.42 motion was overruled by the trial court, and that decision was also affirmed on appeal. After that, his petition in federal district court for a writ of habeas corpus, 28 U.S.C. § 2254, was denied.[4]

Significantly, Appellant did not raise mental retardation as a challenge to his death sentences as an issue at any stage of the above proceedings.

In June 2002, the United States Supreme Court issued *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, which held, in equivalence with our KRS Chapter 532 statutory provisions, that the execution of a "seriously mentally retarded offender" is prohibited by the Eighth Amendment of the United States Constitution. After *Atkins* was issued, Appellant filed *Bowling IV* in Fayette Circuit Court seeking to challenge his two death sentences on the basis that he is mentally retarded. The trial court denied the motion and, upon review, we affirmed. *Bowling IV*, 163 S.W.3d 361. As relevant to the present appeal, and as further discussed below, in *Bowling IV* we determined that Appellant had procedurally defaulted upon any challenge to his death sentence by a claim of mental retardation by failing to raise the issue at the proper time. We further held that none of the potentially applicable exceptions to the default applied, and suggested that the most relevant historical IQ scores were the 86 and 87 scores measured around the time of the crimes and trial. Upon review of the issue, we ultimately determined that Appellant was not able to make a prima facie showing that he is, in fact, mentally retarded.

In reaching our conclusion in *Bowling IV* that Appellant could not make a prima facie showing that he was mentally retard-

---

**3.** *See, e.g.*, KRS 532.135(1) ("At least thirty (30) days before trial, the defendant shall file a motion with the trial court wherein the defendant may allege that he is a seriously mentally retarded defendant and present evidence with regard thereto . . . .").

**4.** *See Bowling v. Commonwealth*, 873 S.W.2d 175 (Ky.1993), cert. denied, *Bowling v. Kentucky*, 513 U.S. 862, 115 S.Ct. 176, 130

L.Ed.2d 112 (1994); *Bowling v. Commonwealth*, 981 S.W.2d 545 (Ky.1998), cert. denied, *Bowling v. Kentucky*, 527 U.S. 1026, 119 S.Ct. 2375, 144 L.Ed.2d 778 (1999); and *Bowling v. Parker*, 138 F.Supp.2d 821 (E.D.Ky.2001), cert. denied, *Bowling v. Parker*, 344 F.3d 487 (6th Cir.2003), cert. denied sub nom., *Bowling v. Haeberlin*, 543 U.S. 842, 125 S.Ct. 281, 160 L.Ed.2d 68 (2004).

ed, we hypothetically considered the implications of the Flynn Effect[5] and the margin of error effect on his historical IQ readings, and determined that consideration of those two factors would not change the result. And while we did not specifically consider the practice effect[6] in *Bowling IV*, as further discussed below, it is clear that the additional consideration of this single factor would not change the result reached in *Bowling IV*.

In 2007, the AAMR issued revised guidelines addressing how practitioners should interpret IQ scores. More specifically, the new guidelines recommended that IQ scores be interpreted in light of the Flynn Effect, the practice effect, and the margin of error effect.[7] As a practical result, under the liberalized guidelines, it is more likely that a borderline IQ score will be interpreted as reflecting that the subject is mentally retarded, because application of these factors tend to push the adjusted IQ score downward. Notwithstanding our holdings in *Bowling IV*, and believing that the new guidelines would justify additional mental retardation litigation, on July 24, 2007, Appellant filed the present petition for a declaratory judgment[8] seeking to challenge the implementation of his two death sentences on the basis that he qualifies as a seriously mentally retarded offender upon application of the new AAMR guidelines.

The petition sought a holding from the circuit court that the relevant mental retardation statutes contained in KRS Chapter 532 must now be interpreted in light of the new AAMR guidelines. In the alternative, Appellant requested that if the statutes prevented the consideration of these factors, then the statutes be declared unconstitutional as being in violation of the Eighth Amendment of the United States Constitution and Section Seventeen of the Kentucky Constitution. Moreover, Appellant argued that upon application of these factors to his historical IQ scores, he qualifies as being severely mentally retarded and thus ineligible for execution.

The Commonwealth responded with a motion to dismiss on the basis that the petition amounted to an impermissible use of a declaratory judgment proceeding to collaterally attack our holding in *Bowling IV*. In ruling on the motion, the Circuit Court noted that in *Bowling IV* we comprehensively addressed issues relating to the Appellant's mental retardation claim, and accordingly held that the petition was an unlawful collateral attack on our 2005 decision. *See Back's Guardian v. Bardo*, 234 Ky. 211, 27 S.W.2d 960, 963 (1930). ("The purpose of the Declaratory Judgment Act was to have a declaration of rights not theretofore determined, and not to determine whether rights theretofore adjudicated had been properly adjudicat-

5. The Flynn Effect is the theory that as time passes since an IQ test is first developed and normalized, a higher average score is achieved because of such factors as television and improved nutrition and the margin of error effect refers to the recognition that absolute precision in IQ tests is not possible.

6. The practice effect is the theory that taking an IQ test on subsequent occasions within a relatively short period of time will result in an improved score as a result of the prior experience.

7. It appears that the AAMR had previously determined that the margin of error effect should be applied to test score interpretation, and so the 2007 changes do not, per se, specifically include this factor. However, the parties discuss this factor as grouped with the Flynn Effect and the practice effect, and so we also follow this procedure.

8. *See* KRS 418.040; CR 57.

ed."). The circuit court consequently denied the motion.

While we agree with the trial court that Appellant's present claim amounts to an impermissible use of the declaratory judgment process to collaterally attack the *Bowling IV* proceedings,[9] as further discussed below, we affirm on the broader grounds that it is the law of the case, as determined in *Bowling IV,* that Appellant has waived his right to challenge his death sentences based upon a claim of mental retardation, and that, moreover, even upon consideration of the AAMR guideline changes, and consideration of the practice effect as applied to the *Bowling IV* analysis, Appellant cannot make a prima facie showing that he is seriously mentally retarded. As such, we affirm the circuit court's dismissal of the petition, although on slightly different grounds.

## II. PROCEDURAL DEFAULT, EXCEPTIONS, AND LAW OF THE CASE

As further discussed below, pursuant to *Bowling IV,* it is the law of the case that: (1) Appellant has procedurally defaulted upon his claim that he is not subject to execution because he is mentally retarded; and that (2) the adequate cause exception to procedural default does not apply. It is similarly the law of the case that (3) the actual innocence/fundamental miscarriage

of justice exception to procedural default does not apply upon the application of the Flynn Effect and the margin of error effect to Appellant's historical IQ scores. Further, upon a *de novo* updating of *Bowling IV* to include consideration of the practice effect upon the historical IQ data, we again conclude that Appellant cannot make a prima facie showing that he is mentally retarded.

### A. Procedural Default

■ In *Bowling IV,* Appellant based his challenge to his death sentence solely on the United States Supreme Court's holding in *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, that the Eighth Amendment's proscription against cruel and unusual punishment prohibits the execution of a mentally retarded offender. The decision assigned to the states, however, the authority to determine who qualifies as a mentally retarded offender. In this vein, *Atkins* uncritically cited to Kentucky's already-existing statutory scheme as among those prohibiting the execution of mentally retarded offenders, and it is worth noting that our definition of serious mental retardation is substantially the same as the definitions adopted by the AAMR and the American Psychiatric Association, and tacitly approved by the Supreme Court in *Atkins. Compare Atkins,* 536 U.S. at 308–309, fn. 3 and fn. 4, 122 S.Ct. 2242, with KRS 532.130(2).[10]

---

9. Appellant urges that if we find his action improper as a declaratory judgment proceeding that we treat it as a CR 60.02 proceeding. However, that procedure is no more availing than his declaratory judgment action. *Gross v. Commonwealth,* 648 S.W.2d 853, 856 (Ky. 1983). (CR 60.02 was never meant to be used as just another vehicle to revisit issues that should have been included or could have been included in prior requests for relief. Nor is it intended to be used as a method of gaining yet another chance to relitigate previously determined issues). And further, as explained herein, the law of the case rule would likewise

preclude success under CR 60.02 (or any other procedural method Appellant may seek to undertake).

10. KRS 532.130(2) provides as follows: "A defendant with significant subaverage intellectual functioning existing concurrently with substantial deficits in adaptive behavior and manifested during the developmental period is referred to in KRS 532.135 and 532.140 as a seriously mentally retarded defendant. 'Significantly subaverage general intellectual functioning' is defined as an intelligence quotient (I.Q.) of seventy (70) or below."

In *Bowling IV*[11] we acknowledged that *Atkins* recognized a new and fundamental constitutional right and, therefore, that the decision must, when an offender has not previously had the opportunity to raise the issue, be retroactively applied;[12] however, we further held that retroactivity was inapplicable in Appellant's case because, by means of KRS Chapter 532, we had a statutory procedure in effect at the time of his trial under which he could have asserted the identical right recognized twelve years later in *Atkins*. *Bowling IV*, 163 S.W.3d at 370. In reaching this conclusion, we explained as follows:

> . . . . Kentucky [ ] had in effect at the time of [Appellant's] trial a statute affording the same right subsequently created by *Atkins*. "*Atkins* merely reaffirmed this State's preexisting prohibition against executing the mentally retarded." [citation omitted] . . . .

Even a constitutional right can be waived by failure to timely assert it. *Breard v. Greene*, 523 U.S. 371, 376, 118 S.Ct. 1352, 1355, 140 L.Ed.2d 529 (1998) (rules of procedural default apply to constitutional provisions).

> No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.

*Coleman v. Thompson*, 501 U.S. 722, 751, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991) (internal citation and quotation omitted). *See also Sawyer v. Whitley*, 945 F.2d 812, 823–24 (5th Cir.1991) (claim of incompetency to stand trial partially because of mental retardation procedurally defaulted where not assert-

ed at trial), aff'd, *Sawyer v. Whitley*, 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992); *cf. Bonar v. Commonwealth*, 180 Ky. 338, 202 S.W. 676, 677 (1918) (waiver may be either by express consent, by failure to assert in time, or by conduct inconsistent with a purpose to insist on it). "[T]he question is . . . whether at the time of the default the claim was 'available' at all." *Smith v. Murray*, 477 U.S. 527, 537, 106 S.Ct. 2661, 2667, 91 L.Ed.2d 434 (1986).

. . . .

Kentucky's exemption statute, KRS 532.140(1), was enacted effective July 13, 1990. Appellant's trial began on December 10, 1990. During the interim, Appellant was examined by two psychologists, one appointed by the trial court and the other selected by his attorneys. Each psychologist administered a separate IQ test, the results of which *measured Appellant's IQ at 86 and 87*, respectively. *Thus, Appellant was afforded both the opportunity to assert his mental retardation claim and the expert witnesses necessary to prove it (if it was provable). He chose not to assert the claim at trial and thereby waived it. Accord Winston v. Commonwealth*, 268 Va. 564, 604 S.E.2d 21, 51 (2004) ("Winston's remaining claims concerning the subject of mental retardation are waived because he deliberately declined to raise a claim of mental retardation under the statutory provisions that apply to him and his trial."). *Compare Head v. Hill*, 277 Ga. 255, 587 S.E.2d 613, 620 (2003) (defendant could have litigated the issue of his alleged mental retardation at trial but chose not to do so, thus, he was not denied the

---

**11.** Citing to *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

**12.** KRS 532.140 provides, "The provisions of KRS 532.135 and 532.140 shall apply only to trials commenced after July 13, 1990."

right to litigate the issue; he had such a right and waived it); with *Rogers v. State*, 276 Ga. 67, 575 S.E.2d 879, 880 (2003) (defendant who was tried before effective date of mental retardation exemption statute could not be held to have waived claim to exemption).

*Id.* at 371–372. (emphasis added, footnote omitted).

We further rejected Appellant's claim that our statutory procedures were at variance with *Atkins*, and that therefore while he may have procedurally defaulted pursuant to Chapter 532, he had not procedurally defaulted under *Atkins*. It accordingly is the law of the case, as established in *Bowling IV*, that Appellant has procedurally defaulted upon his mental retardation claim. *Brown v. Commonwealth*, 313 S.W.3d 577, 610 (Ky.2010) (" 'Law of the case' refers to a handful of related rules giving substance to the general principle that a court addressing later phases of a lawsuit should not reopen questions decided by that court or by a higher court during earlier phases of the litigation.").

We applied similar reasoning in *Bowling v. Commonwealth*, 224 S.W.3d 577 (Ky. 2006), a proceeding in which Appellant sought to avoid his death sentences by claiming that he functions at the level of an eleven-year-old child, and thus could not be executed pursuant to *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (holding that the Eighth Amendment's proscription against cruel and unusual punishment prohibits the execution of individuals with the mental age of a juvenile). In rejecting that claim, we similarly relied upon our finding of procedural default in *Bowling IV*, stating:

"Thus, at the time of his trial Kentucky had in effect a statute that prohibited the execution of an offender under the age of sixteen. As such, Bowling's claim that execution is prohibited because he functions at the level of an eleven-year-old child could have been asserted at trial, in his RCr 11.42 motion, or his prior CR 60.02 motion.... For this reason, the same rationale espoused in [*Bowling IV*] that supported a finding that Bowling procedurally defaulted his mental retardation claim applies with equal force to support a finding that his current claim, even if viable, would have been procedurally defaulted as well."

*Bowling*, 224 S.W.3d at 584.

Accordingly, we again reiterate, Appellant has procedurally defaulted upon his mental retardation claim. He did not timely raise the issue, undoubtedly because contemporaneous IQ test scores showed him to be nowhere near seriously mentally retarded.

**B. Adequate Cause for Default Exception**

■ Because the procedural default rule is not absolute, in *Bowling IV* we reviewed Appellant's claim consistently with the United States Supreme Court's practice of granting further review of a procedurally defaulted constitutional claim when "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law [ . . . . ]" *Coleman v. Thompson*, 501 U.S. 722, 749–50, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).[13] Upon review, we held that the

---

**13.** *See also Edwards v. Carpenter*, 529 U.S. 446, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000) (Bryer, J., concurring) ("There are three situations in which [a procedural default upon state grounds] will not bar federal claims: (1) where failure to consider a prisoner's claims will result in a "fundamental miscarriage of justice," *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); (2) where the state procedural rule was not " 'firmly established and regularly followed,' " *Ford v. Georgia*, 498 U.S. 411, 423–424, 111

exception was not applicable under the facts of this case because no one was responsible but Appellant and his trial counsel for failing to timely raise the claim:

> .... The Commonwealth did not prevent Appellant from presenting his mental retardation claim; he simply did not assert it at his trial or in his RCr 11.42 motion.
>
> . . . .
>
> .... Appellant does not demonstrate any cause other than his own failure to raise it. (He did not claim in his RCr 11.42 motion that his counsel were ineffective for failing to claim the exemption.)

*Bowling IV*, 163 S.W.3d at 371–372. As such, our clear holding in *Bowling IV* was that Appellant was not excused from the procedural default by having shown adequate cause for failure to timely raise the issue. It follows that this determination is the law of the case, and not subject to relitigation in this proceeding. *Brown,* 313 S.W.3d at 610.

### C. Miscarriage of Justice/ Actual Innocence Exception

■ The "miscarriage of justice" exception to the procedural default rule applies "where a constitutional violation has probably resulted in the conviction of one who is actually innocent," and permits review even in the absence of a showing of cause for the procedural default. *Murray v. Carrier,* 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). In the context of a death sentence, "actual innocence" means "that there was no aggravating circumstance or that some other condition of

eligibility had not been met." *Sawyer v. Whitley,* 505 U.S. 333, 345, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). In that circumstance, the petitioner must "show by clear and convincing evidence that but for constitutional error at his sentencing hearing, no reasonable juror would have found him eligible for the death penalty." *Id.* at 350, 112 S.Ct. 2514; *Bowling IV,* 163 S.W.3d at 373. We held in *Bowling IV* that if an offender at risk for the death penalty could prove that he is mentally retarded, this would satisfy the required "clear and convincing" standard. *Bowling IV,* 163 S.W.3d at 373.

In *Bowling IV* [14] we concluded that Appellant had failed to make a sufficient prima facie showing that he is mentally retarded so as to require an evidentiary hearing, and that he had also failed to show that the probable result, if a hearing was not granted, would be the execution of a mentally retarded person who is not eligible for the death penalty. *Id.* In reaching this determination we specifically factored into our review the hypothetical consequences of a three-point Flynn Effect and a five-point margin of error effect. In concluding that Appellant could not make a showing of mental retardation, we explained our reasoning as follows:

> Not every defendant who claims to be mentally retarded is entitled to a hearing on the issue.
>
> [T]he granting of an evidentiary hearing on the issue of mental retardation is not a perfunctory matter or a ministerial duty of the trial court, and is not guaranteed to every [defendant] in every [capital] case. There is no auto-

S.Ct. 850, 112 L.Ed.2d 935 (1991); *James v. Kentucky,* 466 U.S. 341, 348–349, 104 S.Ct. 1830, 80 L.Ed.2d 346 (1984); and (3) where the prisoner had good "cause" for not following the state procedural rule and was "prejudice[d]" by not having done so, [*Wainwright*

*v. Sykes,* 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).]'").

**14.** None of the records from prior proceedings are contained in the record on appeal in this case.

matic right to a hearing on the issue of mental retardation, whether the hearing is sought pre-trial, while the case is on appeal, or as post-conviction relief. *State v. Williams*, 831 So.2d 835, 858 n. 33 (La.2002) (internal citation and quotation omitted).[15]  To be entitled to a hearing, there must be at least a prima facie showing that the defendant may, in fact, be mentally retarded.

> Were it otherwise, then literally any prisoner under a death sentence could bring an *Atkins* claim in a second or successive petition regardless of his or her intelligence.  No rational argument can possibly be made that this result is appropriate. . . .

*In re Holladay*, 331 F.3d 1169, 1173 n. 1 (11th Cir.2003).

. . . .

We hold that to be entitled to an evidentiary hearing on a claim of entitlement to the mental retardation exemption provided by KRS 532.140(1), a defendant must produce some evidence creating a doubt as to whether he is mentally retarded.

As noted earlier, two IQ tests were administered to Appellant within a month of his December 1990 trial.  *The WAIS–R test administered by the court-appointed psychologist measured Appellant's IQ at 86.  The Shipley–Hartford Intelligence Scale test administered by the psychologist selected by Appellant's attorneys measured Appellant's IQ at 87.*  In his brief and at oral argument, Appellant claimed that an IQ test administered when he was in junior high school had measured his IQ at 74, within the five-point margin of error that he claims should be applied to the definition in KRS 532.130(2) of "significantly subaverage general intellectual functioning."  However, the only pre–1990 IQ test scores found in this record are those found in Appellant's seventh grade record (Exhibit 5 to petition filed in the Fayette Circuit Court), which reflects that Appellant was twice administered the Otis Mental Ability Test. The first test, administered on November 28, 1966, measured his IQ at 84; the second test, administered on March 31, 1967, measured his IQ at 79.  We find no evidence in this record of a test measuring Appellant's IQ at 74 [as contended by Appellant and Justice Keller in his dissent; *see also* fn. 18, *infra* ].[16]

Appellant's IQ scores show that he could not meet the "significantly subaverage intellectual functioning" criterion of the statutory definition of "mental retardation" *even if the General Assembly had provided for application of a five-point margin of error and a three-point "Flynn effect."*  Thus, we need not address whether he meets the "substantial deficits in adaptive behavior" criterion of the definition.  *Johnson v. Commonwealth*, 267 Va. 53, 591 S.E.2d 47, 59 (2004) (where statutory threshold was IQ of 70 and defendant's IQ test scores were 75 and 78, the record "shows as a matter of law that [he] is unable to meet the definition of "mentally retard-

---

**15.**  Superseded in part by statute as stated in *State v. Turner*, 936 So.2d 89, 94–95 (La. 2006).

**16.**  We further stated that "the relevancy of an IQ score of 74 at age thirteen would be clearly outweighed by Appellant's IQ scores of 79 measured five months later, and 86 and 87 measured twenty-four years later and in the same time frame as the offenses and the trial."  We further noted that "[i]f a trial court found otherwise, we would deem that finding to be clearly erroneous.  CR 52.01." *Bowling*, 163 S.W.3d at 384, fn. 37.

ed").["[17]] Thus, even if Appellant had not procedurally defaulted this claim, he has produced no evidence that creates a doubt as to whether he is mentally retarded. Denial of an opportunity to further litigate this claim will not result in a fundamental miscarriage of justice, *Coleman v. Thompson,* 501 U.S. at 750, 111 S.Ct. 2546, because it will not result in the imposition of the death penalty where a "condition of eligibility ha[s] not been met." *Sawyer v. Whitley,* 505 U.S. at 345, 112 S.Ct. at 2522.

*Id.* at 383–384 (footnotes omitted).

As the above discussion indicates, *Bowling IV* establishes that significant weight must be given to the 86 and 87 IQ scores Appellant obtained in 1990, near the time of the crimes and the trial. *Id.,* 163 S.W.3d at 384, fn. 37. Further, we also considered the 79 IQ score he had obtained in March of 1967, after previously having scored an 84 [18] in November of 1966, and noted that Appellant was unable to establish a prima facie showing of mental retardation even if a Flynn Effect of three points and margin of error effect of five points were deducted from the 79 score, because this would produce an adjusted IQ score of 71,[19] which is still above

our definitional line of 70. For whatever reason, *Bowling IV* did not incorporate (or otherwise mention) the practice effect into its discussion.

■ Accordingly, the *only* difference between this case and *Bowling IV* is that *Bowling IV* did not specifically consider the practice effect in its hypothetical; and it is *only* because of this omission that *Bowling IV* does not, with full force, establish Appellant's lack of mental retardation as the law of the case in the context of Appellant's present argument (which argues for consideration of the practice effect). Accordingly, with *Bowling IV* as our beginning point, we review *de novo* the significance of the application of the practice effect on the *Bowling IV* analysis. As explained below, consideration of the practice effect does not change the result we reached in *Bowling IV.*

As noted, Appellant had taken an IQ test only four months before he achieved the 79 IQ score in March 1967, and so, arguably, a practice effect [20] adjustment is applicable to this score. Therefore, if we begin with a starting point of Appellant's 79 score, adjusted downward for the Flynn Effect (three point deduction) and maxi-

---

**17.** Judgment vacated, and case remanded to the Supreme Court of Virginia for further consideration in light of *Roper v. Simmons,* 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). *Johnson v. Virginia,* 544 U.S. 901, 125 S.Ct. 1589, 161 L.Ed.2d 270 (2005).

**18.** While the majority concluded that the March 1967 test score was clearly an "84," *Bowling IV,* 163 S.W.3d at 384, fn. 37, Justice Keller suggested in his dissent that the score "appears to include a "7" superimposed over an "8." *Bowling IV,* 163 S.W.3d at 387. The relevant IQ record is replicated at Page 387 of *Bowling IV.* Whatever deficiencies there may be in the handwriting, the IQ score which is recorded is clearly an 84, and, moreover, it is highly unlikely that anyone would have undertaken such an inept attempt to correct an "84" to a "74." There is no reason for some-

one to have tried to correct an "84" to a "74" and yet leave the number looking exactly like an "84." Accordingly, we reject Appellant's renewed attempt to reopen this debate.

**19.** While *Bowling IV* did not actually go through these calculations, it is clear that our discussion reflects the described line of reasoning.

**20.** *See Thomas v. Allen,* 614 F.Supp.2d 1257, 1291 (N.D.Ala.2009) ("Practice effect refers to gains in IQ scores on tests of intelligence that result from a person being retested on the same test.... For example, ... [t]he WAIS–III manual reports an average increase of 5 points on the Full–Scale IQ between administrations with intervals of 2 to 12 weeks." Quoting AAIDD, 2007 User's Guide at 17–20.).

mum margin of error on the low side (five point deduction) we arrive at an adjusted score of 71 (79 − 8=71). From there, an additional two point or more downward adjustment to account for the practice effect would produce an IQ score below 70, which indeed would meet our statutory definition for severely mentally retarded, and thereby preclude Appellant's execution. However, this would be a deeply flawed approach to updating *Bowling IV* for the practice effect.

We first note that Appellant's March 1967 score went *down* from his November 1966 score, not *up*, as would be predicted under the practice effect theory. Therefore, it is questionable whether the practice effect is even applicable in this situation.

But more important than that, as suggested in *Bowling IV*, the IQ scores of 86 and 87 Appellant achieved in 1990 clearly weigh against singling out the 79 score as the principal focal point of the inquiry. In the final analysis, it is an inescapable fact that Bowling achieved IQ scores of 86 and 87 in 1990 (which pursuant to the margin of error effect may mean he has an IQ as high as 91 or 92). Focusing on the lower of these, this means that Appellant had an unadjusted IQ score measuring sixteen points (22.9%) above our definitional line of 70. So this is not even a borderline case of mental retardation, and it is thereby clear that applying the practice effect to the *Bowling IV* analysis does not change the ultimate result. In this vein, it is worth noting that if a three point Flynn Effect, a five point margin of error effect, and a five point practice effect[21] are all applied to Appellant's 86 IQ score, this produces an

adjusted score of 73–still above the 70 IQ limit.

Accordingly, we are unpersuaded that incorporation of the practice effect into the *Bowling IV* mental retardation analysis changes the result we reached in that case. We decline, as Appellant would suggest, to take no notice of the 86 and 87 IQ scores from 1990, focus solely on the 79 score from 1967, apply a deceptive 10 or more point reduction thereto, and thereby go along with the charade that Appellant has made a prima facie case of mental retardation. This is not even a close case, and we therefore, consistent with *Bowling IV*, reject Appellant's claim that he has made a prima facie case of mental retardation.

### D. Summary

■ The law of the case doctrine holds that an appeal settles all errors that were or might have been relied upon. *Sowders v. Coleman*, 223 Ky. 633, 4 S.W.2d 731 (1928). It is intended to prevent defendants from endlessly litigating the same issue in appeal after appeal and also to prevent a dissatisfied party from presenting piecemeal issues to the appellate courts so that no decision is ever final. *Commonwealth v. Tamme*, 83 S.W.3d 465, 468 (Ky.2002).

The central issue in this proceeding is whether Appellant is entitled to relief from his death sentences pursuant to a claim of mental retardation. *Bowling IV* has already established that he is not, and to the extent that that decision needed updating to reflect the implications of the practice effect, we have done so herein and determined that this does not change the result. Therefore, Appellant is barred from further litigating this particular claim. *In-*

**21.** It bears emphasis that the practice effect in the usual case would not be applied in this way. This effect refers to only relatively short term periods between tests; it could not seriously be contended that the 1966 and 1967 tests had an actual practice effect on Appel-lant's 1990 tests. We use this example only as a surrogate to further demonstrate that the additional application of the practice effect to the *Bowling IV* analysis could not possibly change the conclusion reached in that case.

*man v. Inman*, 648 S.W.2d 847, 849 (Ky. 1982) (The law of the case doctrine is a rule under which when an appellate court has passed on a legal question, the legal questions thus determined by the appellate court will not be differently determined on a subsequent appeal in the same case); *see also Magwood v. Patterson*, —— U.S. ——, 130 S.Ct. 2788, 2801, 177 L.Ed.2d 592 (2010) ("If a petitioner does not satisfy the procedural requirements for bringing an error to the state court's attention— whether in trial, appellate, or habeas proceedings, as state law may require—procedural default will bar federal review.").

### III. REQUEST FOR AN ADVISORY OPINION

In an apparent anticipation of our approach to deciding this case, Appellant requests that if we resolve his claim upon procedural grounds that we nevertheless address his arguments upon the merits because they have "broad implications for a substantial number of death penalty cases presently awaiting trial, as well as future cases." He notes that cases are being held in abeyance pending a decision in this case,[22] and asserts that a decision on the ramifications of the AAMR guidelines "will impact a vast number of cases

and avoiding resolution of the issue will only result in the issue being raised in other death penalty cases, both at trial and in post-conviction'" and therefore "it would not serve anyone's best interest for this Court to avoid resolving the legal issue, only for it to arrive at this Court again in the relatively near future—likely in a case that is now in abeyance pending the resolution of this one." He also cites us to lower court cases in which *Bowling IV* has been interpreted to preclude consideration of the Flynn Effect, the practice effect, and the margin of error effect.

However, based upon our disposition as explained above, the substantive issues raised by Appellant in his petition for a declaratory judgment are not properly before us; accordingly, we are prevented from deciding those issues on the merits. *Philpot v. Patton*, 837 S.W.2d 491 (Ky. 1992). ("Our courts do not function to give advisory opinions, even on important public issues, unless there is an actual case in controversy.").[23] We will therefore await a proper case to address the broader issues raised by Appellant.[24]

### IV. CONCLUSION

For the foregoing reasons, the judgment of the Fayette Circuit Court is affirmed.

---

**22.** In fact, Appellant himself has a federal habeas corpus case being held in abeyance pending the result of this case in which he raises substantially the identical mental retardation claim raised in this proceeding. *See Bowling v. Simpson*, United States District Court, Eastern District of Kentucky, Civil Action No. 05–CV–523–JBC, Order Filed 10/27/08, *Bowling Brief*, Appx. 3; *In re Bowling*, 2007 WL 4943732 (6th Cir.2007) (unpublished). Further, at the same time *Bowling IV* was being litigated, Appellant was also pursuing an identical mental retardation claim by seeking to reopen his federal habeas corpus proceedings. *See In re Bowling*, 422 F.3d 434 (6th Cir.2005). In addition, as noted at page 535, *supra*, Appellant has also challenged his execution on the basis that he has the mental functioning of an eleven year-old. Thus, this

is no less than the fifth proceeding to address this identical, or a similar, issue.

**23.** In the recent case of *Wilson v. Commonwealth*, —— S.W.3d ——, 2012 WL 1889718 (Ky.2012) (also rendered May 24, 2012), death row inmate Gregory Wilson alleged immunity from the death penalty by reason of mental retardation. He did not, however, raise as an issue the implications of the recent AAMR changes, and so that issue was not addressed in that decision. However, upon application of *Bowling IV*, we remanded the cause to the trial court for additional proceedings.

**24.** In *Bowling IV* we, perhaps inconsistently, stated both that "[g]enerally, accepted definitions within the scientific community will no

MINTON, C.J., ABRAMSON, CUNNINGHAM, SCHRODER and SCOTT, JJ., concur. NOBLE, J. not sitting. ABRAMSON, J., concurs by separate opinion.

ABRAMSON, J., concurring:

I concur but write separately to emphasize one point. In *Atkins v. Virginia,* 536 U.S. 304, 306-07, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the United States Supreme Court recognized not only the diminished criminal responsibility, indeed "moral culpability," of a mentally retarded offender but also society's interest in not executing a mentally retarded person. Thus, at first blush it may seem inappropriate to say that a defendant can by his, or more likely his counsel's, inaction procedurally default this issue. The societal interest is not served by a procedural rule that requires a court to overlook clear proof, in the record, of mental retardation. In fact, the "actual innocence" exception to the procedural default rule recognized by the Supreme Court in *Sawyer v. Whitley,* 505 U.S. 333, 345, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992), assures that an offender who is actually mentally retarded has an avenue of relief, *i.e.,* he can show by clear and convincing evidence that he is ineligible for the death penalty and thus avoid the consequences of a procedural default.

doubt be refined as our knowledge of this area advances", *Bowling IV,* 163 S.W.3d at 375 (*citing Howell v. State,* 151 S.W.3d 450, 455-56 (Tenn.2004)), thereby implying that we would consider such developments in future cases, and that "absent proof that the statutory definition of 'significantly subaverage general intellectual functioning' in KRS 532.130(2) is unconstitutional, any change in that definition must emanate from the General Assembly, not this Court." *Id.* This highlights the need for us to consider the AAMR Guideline revisions in the context of an actual case or controversy.